KANSAS CITY, M. & O. RY. CO. OF TEXAS v. ESTES.  (No. 852.)

(Court of Civil Appeals of Texas. El Paso. May 2, 1918. On Rehearing, June 6, 1918.)

1. MASTER AND SERVANT ⊸285(11) — INJURIES TO SERVANT — PROXIMATE CAUSE — QUESTIONS OF FACT.

Where his foreman had notified plaintiff, who was a switchman, that he would make a switching movement by "shoving" instead of "kicking" a string of cars, and plaintiff while on top of the cars, noticing the foreman's absence, went back along the cars to look for him, as it was his duty to do, and was injured by falling between the cars when uncoupled by the foreman, who, without notifying plaintiff, had changed the method of switching and was preparing to "kick" the cars, the question as to whether the change of method was the proximate cause of the injury was for the jury.

2. MASTER AND SERVANT ⊸226(1)—INJURY TO SERVANT — ASSUMPTION OF RISK — MASTER'S NEGLIGENCE.

A servant does not assume the risk of his master's negligence, nor is he required to anticipate such negligence.

3. MASTER AND SERVANT ⊸97(5) — PROXIMATE CAUSE OF INJURY.

The action of a switching foreman in releasing coupling, without warning, causing a string of cars to part as a switchman was stepping from one car to another at the point of separation, was negligence proximately causing the injuries to the switchman from falling from the cars, if the foreman, at the time of releasing the coupling, in the exercise of ordinary care, could have reasonably anticipated that the switchman might be at the point of separation and injured by the unexpected parting, and, it was not necessary, for such action to be the proximate cause of the injury, for the foreman to have known as a fact that the switchman was at that place.

4. TRIAL ⊸352(1) — INJURY TO SERVANT — SPECIAL ISSUES.

In an action for injury to a switchman due to falling between cars uncoupled by his foreman, it was not error to refuse to submit a special issue as to whether the injury was the result of an accident, which defined "accident" as a thing which occurs without fault of any person; such definition being misleading in not defining the word "fault."

5. MASTER AND SERVANT ⊸97(5) — INJURY TO SERVANT—ANTICIPATED RESULT.

Where switchman was injured by falling between cars uncoupled by his foreman, the action of the foreman was negligent if, in the exercise of ordinary care, the foreman might reasonably have foreseen that, when he uncoupled the cars, the switchman might be in the act of stepping from one car to another, and it was not necessary, for the act to be negligent, that the foreman should have foreseen that the switchman would be so doing.

6. TRIAL ⊸350(2) — SPECIAL ISSUES — FORM AND SUBSTANCE.

In submitting cases upon special issues, the court should submit the ultimate controlling issue of fact, and not confuse the jury by requiring them to answer a mass of minor and evidentiary issues.

7. MASTER AND SERVANT ⊸88(1)—LIABILITY FOR INJURIES—DEFENSES.

That plaintiff has procured employment by false and fraudulent statements contained in his application for employment is no defense to an action against his employer for injuries.

Error from District Court, Tom Green County; C. E. Dubois, Judge.

Action by P. L. Estes against the Kansas City, Mexico & Orient Railway Company of Texas. Judgment for plaintiff, and defendant brings error. Affirmed.

H. S. Garrett, of San Angelo, Ellis Douthit, of Sweetwater, and Alexander, Baldwin & Ridgway, of Ft. Worth, for plaintiff in error. Leonard M. Levy, of Ft. Worth, Blanks, Collins & Jackson, of San Angelo, McLean, Scott & McLean, of Ft. Worth, and Lea, McGrady & Thomason, of El Paso, for defendant in error.

HIGGINS, J. Estes, defendant in error, was in the employ of the Kansas City, Mexico & Orient Railway Company, plaintiff in error, in the capacity of switchman in the yards at San Angelo. He was under the direction and control of the foreman and yardmaster, Chambers. He was a member of a switching crew, which at the time of the accident complained of was composed of himself, Chambers, an engineer, and fireman, all working under the direction and control of Chambers. On October 7, 1914, this crew had occasion to handle a train which had arrived from the West. In this train were 18 cars of live stock next to the engine, and the remainder of the train consisted of 14 box cars containing perishable freight. It was desired to immediately forward the 14 box cars eastward. It was alleged by Estes that Chambers explained to the crew that the switching movement would be made in this wise: That the rear end of the train consisting of the 14 box cars would be shoved west down the main line beyond a Y-switch, and the engine would then pull the 18 cars of live stock back and past switch and then shove them in on the switch. It was further alleged that the engine coupled onto the train, and Chambers caused the train to be handled in a manner different from what it had been explained the movement would be made, and contrary to the instructions and directions previously given Estes; that the engine coupled onto the train and began to shove the same west; that during the movement, Estes, in the discharge of his duties, was walking on top of the train; that when the train had been shoved a short distance, and just as Estes was stepping from one car

to another, Chambers, without warning, negligently released the coupling between the two cars and signaled the fireman and engineer to so control the movement of the engine that the cars would part; that at the time the cars were uncoupled, Estes was on top of the train, Chambers was on the side of one of the cars, and the engineer and fireman were in the engine cab, and that Estes was in such position that he could not be seen by the other members of the crew; that the separation of the train and kicking of the cars in the manner indicated was contrary to the instructions and directions previously given; and that Chambers knew, or in the exercise of ordinary care would have known, that Estes was relying on the directions he had previously received, and that he was expecting the cars to be shoved down the track, and was not expecting them to be kicked as was done.

The case was tried before a jury, and submitted upon special issues. The issues and answers are as follows:

Special Issue No. 1: At the time he released the coupling which caused the string of cars to part, did the foreman, Chambers, know that plaintiff was on top of said string of cars? Answer Yes or No. Answer: Yes.

Special Issue No. 2: At the time he released the coupling which caused the string of cars to part, could the foreman, Chambers, by the exercise of ordinary care, have known the whereabouts and the position in which plaintiff then was? Answer Yes or No. Answer: No.

Special Issue No. 3: At the time the foreman, Chambers, released the coupling which caused the string of cars to part, did he, by word of mouth or other signal of warning, apprise plaintiff of his intention to then cut the cars? Answer Yes or No. Answer: No.

Special Issue No. 4: If you have answered special issue No. 3 No, then state if such failure of the foreman to so warn plaintiff was negligence which proximately caused or contributed to cause the injuries of plaintiff, if any. Answer Yes or No. Answer: Yes.

Special Issue No. 5: Had the foreman advised or instructed plaintiff, or explained, within the presence and hearing of plaintiff, prior to the switching operation in controversy, how such switching would be done and performed? Answer Yes or No. Answer: Yes.

Special Issue No. 6: If you answer special issue No. 5 Yes, then answer: Did the foreman handle the cars in the manner in which he had advised plaintiff the same would be handled? Answer Yes or No. Answer: No.

Special Issue No. 7: If you have answered special issue No. 6 No, then did said foreman advise plaintiff that said switch operation would not be done in the manner in which he had previously advised plaintiff it would be done? Answer Yes or No. Answer: No.

Special Issue No. 8: If you have answered special issue No. 7 No, then was such failure of said foreman to so advise plaintiff negligence which proximately caused or contributed to cause plaintiff's injuries, if any? Answer Yes or No. Answer: Yes.

Special Issue No. 9: Did the plaintiff sustain the injuries, or any of the injuries, alleged in his petition upon the occasion in question? Answer Yes or No. Answer: Yes.

Special Issue No. 10: If you have answered special issue No. 9 Yes, then what amount of damage, if any, do you find plaintiff has sus-

tained by reason of such injuries? Answer this in dollars and cents. Answer: $16,750.

Special Issue No. 11: In being in the position and place in which you may believe and find from the evidence plaintiff was at the time the string of cars parted, was the plaintiff himself guilty of negligence which proximately contributed to cause his injuries, if any? Answer Yes or No. If you answer this issue No, you need not consider special issue No. 12. Answer: Yes.

Special Issue No. 12: If you have answered Yes to either special issue No. 4 or special issue No. 8, and have also answered Yes to special issue No. 11, you will then answer to what extent do you diminish the total damages assessed by you in answer to special issue No. 10? Answer this in dollars and cents. Answer: $4,-187.50.

Special Issue No. 13: Was the injury, if any, sustained by the plaintiff, P. L. Estes, at the time of his fall, the result of risk of his employment assumed by him? Answer Yes or No. Answer: No.

Special Issue No. 6 (requested by defendant): (1) Did the plaintiff fail to exercise ordinary care to watch out for signals indicating the particular method of doing the work at the immediate or exact time of the actual movement which resulted in injury to the plaintiff? Answer: No. (2) If so, were his injuries the proximate result of such failure? Answer: No.

Special Issue No. 17 (requested by defendant): At the time the plaintiff started to step from one car to the other (if you believe he was injured in that way), was the fact that the cars were being or had been uncoupled apparent to ordinary observation by one in the position Estes, the plaintiff, was at the time? Answer: No.

It is admitted that this case is controlled by the federal Employers' Liability Act (Act Cong. April 22, 1908, c. 149, 35 Stat. 65 [U. S. Comp. St. 1916, §§ 8657–8665]). Plaintiff in error has filed a brief of 319 pages, containing 47 assignments, supported by numerous propositions. The assignments will not be considered in detail, for to do so would render this opinion lengthy beyond all reason.

Assignments 1 to 6, inclusive, complain of the refusal to give a peremptory instruction for defendant. It is asserted in support thereof that the undisputed evidence discloses that the negligence of Chambers relied upon as a basis of recovery was not the proximate cause of the injury; that it shows the injury was the result of a risk assumed by Estes; further, that the injury was the result of an unavoidable accident. In addition to the facts found by the jury, there is evidence to the following effect:

The terms "shove" and "kick" are well understood among railroad men in performing their work, and have distinct meanings as applied to the work at hand, which resulted in Estes' injuries. The fireman of the switching crew, Puett, testified:

"When you shove a train of cars, you shove them all up slowly, and when you want to stop, stop them and cut them off. When you kick a train of cars, you shove them fast, and when you get ready to cut them off, pull the pin and let part of them stop and the rest go on."

He further testified that he did not know from the time Chambers told him they would shove the cars in on the main line that he

had changed his mind until he got the "kick" signal.

Before proceeding to handle the train in question, the foreman, Chambers, gave his instructions to the crew as to the manner in which the train would be handled, and the proposed switching movement made. He told them they would "shove" the train back on the main line past the Y-switch, leave the 14 box cars on the west end of the train on the main line, then pull the 18 cattle cars back east of the switch, then place the cattle cars on the Y-switch. Estes asked Chambers if he should ride the string of 14 cars, and Chambers said, "Not necessarily." The importance of this inquiry and answer lies in the fact that if it had been the plan to "kick" the 14 cars on the main line past the switch, then it would have been absolutely necessary for Estes to have ridden them, and set the brakes when the cut of cars had reached the proper location, for otherwise these 14 cars would have been running wild without control. But if these cars were to be "shoved" back on the main line past the switch, then it was not absolutely necessary for Estes to ride that particular part of the train. This is evident, for if they are "shoved," they are controlled by the engine, and when stopped the hand brakes are then set.

The westward movement of the entire train began with the engine on the east end. Chambers and Estes boarded same, and climbed on top of the stock cars. They then walked on top westward towards the rear, Estes being about two car lengths ahead of Chambers. When Estes looked around and saw Chambers the last time, the latter was sitting at the corner on top of a car grasping a handhold, and with his feet on the side of the car. Estes then continued towards the rear, and then again looked back and saw Chambers was missing. Estes was then upon the string of 14 box cars. When he discovered Chambers' absence from the top of the train, he turned back and proceeded eastward. Just as he was stepping from the string of box cars to the string of stock cars, the train at that point parted; he fell to the ground, and was very seriously injured.

The explanation of the parting of the train is that Chambers had descended the side of the train, and as it approached the switch, pulled the pin between the two strings, gave the "kick" signal to the fireman, who communicated it to the engineer, and the "kick" movement was used to place the 14 box cars west of the switch instead of the "shove" movement. The evidence shows that it is the railroad custom to decide what particular switching movement shall be used, when the train reaches the point where the movement is to be consummated; that when the point is reached, the foreman of the switching crew determines which movement shall be used. These decisions require instantaneous determination.

[1] Now, under the facts and circumstances stated, it is contended that Estes was guilty of negligence in turning back and proceeding towards the string of stock cars, because his duty required him to remain on the string of box cars, and Chambers could not reasonably have anticipated that he would do so, and be in a place of danger when the separation was effected; therefore the negligence, if any, of Chambers in changing the switching movement without notice to Estes, was not the proximate cause of the injury, and that Estes' conduct must be deemed the causal act of negligence.

We do not think that such a conclusion necessarily follows. There is ample evidence that when a switchman on top of the cars gets out of sight of the foreman, it is his duty to get where he can see the foreman, so that he can catch the latter's signals; the switchman must keep his eye on the foreman. Estes testified that at the time the cars separated, Chambers had given him no signal, and that he was walking back to see what had become of Chambers, and to be in the neighborhood of the stock cars that were to be shoved on the Y; that it was his duty, when those cars were shoved on the Y, to set the brakes on same on the Y; that he did not know what had become of Chambers from the top of the car; whether he had fallen or not, and he was looking for him, going along, looking from one side to the other.

Harry Rogers, an expert in the matter of train movements, referring to Estes' duty on top of the train while the movement was being made, testified:

"When the foreman went beside the car, if he was two car lengths or a car and a half length from Estes, it was Estes' duty to go on up there and see what he was going to do, or get down on the ground and go see—after the foreman changed his mind and Estes thought he was going to do a thing, he should have seen where he was and known what he was going to do. When Estes saw him leave the corner of the car, it was Estes' duty to go up there and see what he was going to do."

Assuming the truth of plaintiff's evidence, it would appear that he was misled by the instructions given by Chambers prior to the time the movement began, and that Estes was in the performance of a duty while going back to look for Chambers who had disappeared from the corner of the car, where he had been last seen a short time before. Estes was in the performance of this duty at the time Chambers cut the train in two, and signaled the engine crew without Estes' having an opportunity to know of this changed plan. Chambers knew that if he disappeared from the sight of Estes under the circumstances, it would be in the line of Estes' duty to walk back on top of the cars and see what had become of him, or try to get in his sight for further signals. Therefore, under the circumstances, it was an issue of fact whether it should have been reasonably anticipated

by Chambers that Estes might be passing from the top of the box cars to the top of the stock cars at the time of the separation, and thus result in injury to Estes. This was a question of fact, and includes the proposition that the change in the plan of movement without notice to Estes was a proximate cause of the injury.

[2] As to the assumption of risk, it is sufficient to refer to the general rule that the servant does not assume the risk of the master's negligence, nor is he required to anticipate such negligence. The facts detailed present no exception to this rule which would authorize a peremptory ·instruction in defendant's favor. Neither is there any merit in the contention that the undisputed facts show that the injury was the result of an unavoidable accident.

[3] Under the seventh, ninth, and tenth assignments, it is claimed that defendant was entitled to judgment because of the answer to issue No. 2. The issue reads:

"At the time he released the coupling which caused the string of cars to part, could the foreman, Chambers, by the exercise of ordinary care, have known the whereabouts and the position in which plaintiff then was?" This was answered "No."

This question in the language used should not have been submitted. It refers to the question of proximate cause, but does not properly present the issue involved. The evidence shows that Chambers was riding on the side of the car when he pulled the pin and gave the "kick" signal, and in a position where he could not possibly see Estes. Manifestly, he could not have known the whereabouts and position Estes was in. The jury could not have answered the question as it was framed, other than it was answered. All that the law required to make Chambers' negligence a proximate cause of the injury was that in the exercise of ordinary care he could have reasonably anticipated that Estes might be at the point of separation, and be injured by an unexpected parting of the train at that point. Railway Co. v. Bigham, 90 Tex. 223, 38 S. W. 162. The effect of the contention here made is that it was necessary that Chambers must have known that Estes would be there. This is not the law. It is sufficient, so far as this point is concerned, that the jury and trial judge have found that Chambers in the exercise of ordinary care should have reasonably anticipated that plaintiff might be at that place when the train was cut.

It is claimed by the eighth assignment that defendant was entitled to judgment because the jury in answer to the eleventh issue found that plaintiff was guilty of contributory negligence in being in the position and place he was at the time the string of cars parted; and in view of the answer to the second issue, such negligence of Estes must be deemed the causal act of negligence. For reasons indicated above, the finding upon issue 2 is not controlling, and the jury and trial court have found that Chambers' negligence was a proximate cause of the injury. In view of the comparative negligence feature of the federal Employers' Liability Act, the contributory negligence of Estes merely diminished his recoverable damages.

Those assignments which assert that the findings of the jury are so conflicting that a judgment for plaintiff could not properly be rendered thereon are disposed of by what has heretofore been said.

The finding of the jury in response to the second issue for the reasons so indicated is not in conflict with the finding of the jury convicting Chambers of negligence which embraces the question of proximate cause; and as to the finding of contributory negligence, this is not a complete but partial defense only.

The thirteenth assignment complains of the exclusion of certain testimony of the witness Chambers. In this we think there was no error.

[4] Error is assigned to the refusal to submit this issue:

"Was the injury to the plaintiff the result of an accident? In connection with your answering the above question, you are instructed that an 'accident' is a thing that occurs without fault of any person."

We do not think the evidence in this case raises the question of accident. It presents the issues of negligence, vel non, on the part of both Chambers and Estes, also of assumed risk, but in our opinion does not raise the issue of accident so as to require a special submission thereof. Furthermore, the requested charge was properly refused because it was calculated to be misunderstood by the jury, and as presented did not give the jury any clear idea of a correct principle of law, and called more for the expression of the opinion of the jury upon a question of law than for a finding upon any specific question of fact. The question in itself, "Was the injury to the plaintiff the result of an accident?" could have different meanings. It could be said that every unintentional injury is an accident in the sense that it was not intended, was not known that it would happen.

However, many accidents are attributable to negligence. When we come to consider the definition of the word "accident" as given in that charge, the jury are still left to form their own idea of the meaning of the word "accident," or rather to decide for themselves as to what the law should be. The definition says that "accident" means without the fault of any person. What does the word "fault" mean? The requested charge does not define its meaning, nor is there any definition given in the main charge. It has been held that a requested charge, even though otherwise proper, may be re-

fused where some language therein requires definition or explanation. Railway v. Taylor, 79 Tex. 104, 14 S. W. 918, 23 Am. St. Rep. 316; Phoenix, etc., v. Neal, 23 Tex. Civ. App. 427, 56 S. W. 91. If the charge had asked whether the injury happened from an accident that could not have been reasonably foreseen by the use of ordinary care, it would not have been so objectionable. The jury might feel that under a certain state of facts there was or was not fault upon a particular person, yet when they are asked to find whether a particular act is negligence, or whether it could have been reasonably foreseen, and these terms have been defined by the charge of the court, so that the jury cannot misunderstand them, then they are not allowed to exercise their opinion of whether a person was at fault, but are required to find whether, under the evidence, a certain fact within the meaning of the court's charge has taken place. Under the court's charge they were not allowed to substitute their own opinion of what was right and wrong, or whose fault it was. To have given the charge would have in some degree conflicted with the court's definition and substituted the variable standards of jurors as to what the law should be.

[5] Under the sixteenth assignment, complaint is made of the refusal to submit this issue:

"Ought the yardmaster, Chambers, to have foreseen, in the light of the attending circumstances, that when he pulled the pin and the cars parted, that Estes would be in the act of stepping from the box or fruit car to the stock car (if you find that he was so stepping at the time), and that Estes would fall and be injured as the natural and probable consequence of pulling the pin and parting the cars?"

This charge was properly refused, because to have found as desired by defendant would have required a finding that Chambers not only should have foreseen that plaintiff "might" be in the act of stepping from one car to the other at the time they separated, but required that Chambers should have foreseen that plaintiff "would" be in fact in such act of stepping from one car to the other. This is not the law. The requested charge in effect required a finding that Chambers actually knew or should have known that plaintiff would positively be at the place in question when he uncoupled the train, before Chambers' act could be found to be a negligent one; whereas, the law only required a finding that Chambers should have foreseen that plaintiff might be there to justify a finding of the act being negligence. The difference is so plain as not to require argument. Besides, the issue of anticipated consequences was fairly covered in the court's charge on proximate cause.

The reasons assigned for overruling the sixteenth assignment apply equally to assignments 17 to 25, inclusive, which are also overruled.

[6] Assignments 26 to 41, inclusive, complain of what is claimed to be a refusal on the part of the trial court to affirmatively submit defensive issues that plaintiff's own negligence was the sole proximate cause of his injury. These issues were sufficiently covered in the issues submitted, and charge given in connection therewith. There is this further objection to these requested issues, and to practically every issue which defendant requested the court to give, namely, that they are upon minor or evidentiary facts, and not upon the ultimate controlling facts. In submitting cases upon special issues the court should submit the ultimate controlling issues of fact, and not confuse the jury by requiring them to answer a mass of minor and evidentiary issues. A refusal to submit issues of the nature last indicated is not reversible error. An issue as to an evidentiary fact is never proper, unless proof thereof is equivalent to proof also of the ultimate fact. It is not to be commended even in such cases, for all ultimate facts should be submitted for an express finding by the jury without the court being called upon to deduce the ultimate fact as a necessary consequence.

There is no merit in the criticism made of the court's definition of "ordinary care," and "negligence," for which reason the forty-second assignment is overruled.

Assignments 43 to 46 inclusive, assert that the answers of the jury to certain issues were incorrect as a matter of law. The contentions made in this connection seem to be a reiteration of positions taken under other assignments and disposed of by what has heretofore been said. Furthermore, an issue of fact was raised with respect to all of such issues, and it was the province of the jury to pass upon same.

[7] By the forty-seventh assignment it is claimed that the court erred in striking out defendant's trial amendment, setting up that plaintiff had procured employment by certain false and fraudulent statements contained in his application for employment. There was no error in this. Even if all of the facts were as claimed by defendant, it would not constitute a defense. Railway Co. v. Harris, 48 Tex. Civ. App. 434, 107 S. W. 108; Hart v. Railway Co., 205 N. Y. 317, 98 N. E. 493; Lupher v. Railway Co., 81 Kan. 585, 106 Pac. 284, 25 L. R. A. (N. S.) 707. Furthermore, plaintiff was not working under said agreement of employment at the time he was injured. Plaintiff was injured October 7, 1914. The contract of employment, set up by defendant, is dated September 11, 1913. It will be noted that plaintiff had worked for defendant on two different occasions. He went to work for defendant first, upon the occasion he signed said contract, in September, 1913; his testimony is undisputed and reads as follows:

"I worked for the defendant as yardmaster at Sweetwater a little over a year, when the po-

sition was abolished; after that place was abolished. I went to work for the Rock Island at Ft. Worth. I afterwards came back to the Orient as switchman in the yards at San Angelo." "At the time I got hurt, I had been working for the Orient the last time about a month and a half. How came me to come out here to go to work, Mr. Noessel, the trainmaster, wrote me a letter to come back, that my job would be put on at Sweetwater eventually, and he would put me on the yard at San Angelo till he put me back as yardmaster at Sweetwater."

It is perfectly apparent that the contract relied on by defendant had reference to the first time plaintiff was employed by defendant when he worked a little over a year. Then he severed his relations with the defendant. Later he took another employment from it. There is no rule of law that would justify defendant in holding that the contract of the first employment should control the second employment.

All contentions made by plaintiff in error to which specific reference in this opinion has not been made have been considered and are regarded as without merit. Finding no error, the judgment is affirmed.

WALTHALL, J., did not sit, being absent on committee of judges assisting the Supreme Court.

On Rehearing.

In the original opinion it is said:

"The evidence shows that it is the railroad custom to decide what particular switching movement shall be used when the train reaches the point where the movement is to be consummated. That when the point is reached, the foreman of the switching crew determines which movement shall be used. These decisions require instantaneous determination."

In this connection it should be further said that the record justifies the conclusion that when Chambers decided to cut the train in two and make the movement different from the order he had previously given, he should have signaled, or notified Estes in some way before he gave the order to the engineer to operate the train in such manner as would cause it to part in the manner it did.

The motion for rehearing of plaintiff in error has been carefully considered, and we see no occasion to recede from the views expressed in the original opinion. The motion is therefore overruled.