GALVESTON, H. & S. A. RY. CO. v.
ANDREWS.    (No. 1928.)*

(Court of Civil Appeals of Texas. El Paso.
Feb. 3, 1927. Rehearing Denied Feb.
24, 1927.)

1. Trial ⬅194(19)—Instruction that switch-
ing crew were not required to anticipate at-
tempt to couple air hose if not informed
thereof and it was not customary, held prop-
erly refused.

In action for injuries to switching crew
foreman, instruction that if plaintiff did not
inform member of crew that he was going to
couple up air hose on cut of cars, and it was not
usual and customary to do so before coupling
onto cars so situated, crew were not required
to anticipate such attempt, held properly re-
fused as on weight of evidence.

2. Trial ⬅240, 244(4)—Charge that switch-
ing crew's duty was only to use ordinary
care to avoid injury held properly refused as
argumentative and over emphasizing issue.

In action for injuries to switching crew
foreman, instruction that under undisputed tes-
timony plaintiff had authority over crew and
directed them to couple up cars, to which he
had gone to couple air hose, and that it was
only duty of crew to use ordinary care to avoid
injuring any one, held properly refused as ar-
gumentative and unduly emphasizing particular
issue, already twice stated in other charges.

3. Master and servant ⬅296(12)—Trial ⬅
194(19)—Charge that injured foreman in-
structed switching crew how to couple cars
held properly refused as on weight of evi-
dence and misleading.

In action for injuries to switching crew
foreman in coupling onto cut of cars, instruc-
tion that plaintiff instructed crew as to man-
ner of doing work and moving cars held properly
refused as on weight of evidence and misleading,
in view of plaintiff's absence from engine and
crew and latter's direction by other members
thereof, at time.

4. Trial ⬅232(2), 253(4)—Charge submitting
question whether switching crew obeyed in-
jured foreman's instructions held properly re-
fused as not defining instructions and ignor-
ing other affirmative acts of negligence.

In action for injuries to switching crew
foreman in coupling onto cut of cars, charge
submitting question whether crew obeyed plain-
tiff's instructions held properly refused as not
defining such instructions and ignoring other
affirmative acts of negligence proximately caus-
ing injury.

5. Trial ⬅244(1)—Court should not overem-
phasize particular defense by repetition in
charge.

Court should not give undue emphasis to a
particular issue or defense by repeating it in
charge.

6. Trial ⬅260(8)—Charge that switching
foreman assumed known risk of coupling air
hose before engine coupled onto cars held
properly refused as covered by charge given.

In action for injuries to switching foreman,
instruction that plaintiff assumed risk, if safe
way of coupling air hose on cut of cars was to
wait until engine coupled onto them and plain-
tiff knew and appreciated danger of doing so
before, held properly refused as covered by
charge given.

7. Master and servant ⬅295(1)—Trial ⬅
252(11)—Charge that switching foreman as-
sumed risk of coupling air hose before
engine coupled onto cars held properly re-
fused as misleading and abstract.

In action for injuries to switching fore-
man, instruction that plaintiff assumed risk,
if safe way of coupling air hose on cut of cars
was to wait until engine coupled onto them,
and plaintiff knew and appreciated danger of
doing so before, held properly refused as mis-
leading and inapplicable to facts, in that plain-
tiff was not coupling air hose, but closing angle
cock behind cut.

8. Master and servant ⬅291(8)—Submission
of issue of selecting dangerous way of cou-
pling air hose on cut of cars held not war-
ranted.

In action for injuries to switching crew
foreman, evidence held not to warrant submis-
sion of issue whether plaintiff selected danger-
ous way of coupling air hose in doing so be-
fore, instead of after, engine coupled onto cut
of cars; either way being safe in absence of
negligence.

9. Trial ⬅253(4)—Charge to find for defend-
ant, if injured foreman did not tell other
crew members he was going to couple air
hose, and cars were coupled in customary way,
held properly refused as ignoring question of
negligence.

In action for injuries to switching crew
foreman, charge to find for defendant, if plain-
tiff did not tell other members of crew that he
was going to couple air hose on cut of cars, and
work of coupling onto such cars was done in
usual, customary way known to plaintiff, held
properly refused as ignoring question of crew's
negligence.

10. Master and servant ⬅135—Charge deny-
ing recovery for injuries to switching crew
foreman if cars were coupled in customary
way held properly refused.

In action for injuries to switching crew
foreman in coupling onto cut of cars, charge to
find for defendant if coupling was done in usual,
customary way known to plaintiff, held prop-
erly refused as making generality of doing work
in such way an absolute defense, whereas
negligence vel non was real issue.

11. Master and servant ⬅286(33)—Evidence
held to warrant submission of case to jury on
issue of negligence as to switching foreman
coupling cars.

In action for injuries to switching crew fore-
man in coupling onto cut of cars while he was
closing angle cock of air hose behind, evidence
held to warrant submission of case to jury and

⬅For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes
*Writ of error dismissed for want of jurisdiction April 6, 1927.

support finding for plaintiff on primary issue of liability vel non.

**12. Appeal and error ⚖═930(1)—It cannot be assumed that finding supported by evidence was biased or prejudiced.**

It cannot be assumed that finding for plaintiff, supported by evidence on issue of liability vel non, was biased or prejudiced.

**13. Damages ⚖═132(9)—$40,000, for loss of leg by industrious, 35 year old employee, earning $205 per month, held excessive by $10,000.**

$40,000 verdict for loss of leg held excessive by $10,000, but no more, when plaintiff had worked for defendant 13 years, was earning $205 per month when injured, was 35 years old, in good health and industrious, had to be operated on several times, had been unable to earn anything at time of trial, and could do no work requiring education, and continues to suffer great pain almost constantly.

Appeal from District Court, El Paso County; P. R. Price, Judge.

Action by Harry Andrews against the Galveston, Harrisburg & San Antonio Railway Company. Judgment for plaintiff, and defendant appeals. Affirmed conditionally.

Baker, Botts, Parker & Garwood, of Houston, and Kemp & Nagle, of El Paso, for appellant.

Lea, McGrady, Thomason & Edwards, of El Paso, for appellee.

PELPHREY, C. J. This is a personal injury suit which resulted in a verdict and judgment for $40,000 damages in favor of appellee, Andrews.

Upon the occasion of the accident Andrews was the foreman of a switching crew of appellant, composed of Engineer Spence, Fireman Harrell, and Switchmen Johnson, McDowell, Moore, and Andrews. The crew went from El Paso to Ft. Bliss to get some cars and bring them back to El Paso. They went upon the main line about five miles to the track which leads to Ft. Bliss. They then proceeded to Ft. Bliss. After delivering some cars there they picked up an empty box car on warehouse track No. 2, and "kicked" it on the forage yard track. It rolled a few car lengths from the switch and stopped. There was a string of three box cars already upon the forage track several car lengths beyond the point where the one car stopped. After kicking the one car on the forage track, the engine went back to the switch and thence upon the manure track. McDowell and Andrews were riding on the front of the engine. The purpose in going upon the manure track was to get two cars to be taken to El Paso. They found that the two cars could not be then moved. The general direction of the tracks at Ft. Bliss was north and south.

Andrews testified:

"When I found those cars weren't ready for movement, I told McDowell, 'I will go over and couple the air in these three cars, and you can come back with the engine, and we will get them and go to town.' The engine was standing still at that time. When I said that I think McDowell was standing on the footboard, and I was standing on the ground, about that close together (illustrating). The engineer and fireman were in the cab; that would throw them 12 or 15 feet from where I was standing. I told McDowell I was going to couple the air in these three cars and we would take them back to town; I would line up the air and look at them while they were coming there. I says, 'McDowell, I will go over and couple the air in these three cars while you boys come over there, and we will be ready to go to town.' Yes, sir, McDowell heard that, he was standing right by me. I don't know whether any of the other crew heard it or not. * * * After I instructed McDowell what to do, I gave the engineer a back-up sign, and I walked across the track, and they moved south with the engine, backing up, and McDowell was riding on the footboard on the front end of the engine. I started across toward the three cars. It was just about a city block, I believe, across there from where I was to the three cars, not much further, straight across. It was level ground there; right straight across to the three cars; nothing in there at all; nothing but a barbed wire fence. * * * These three cars were standing just a little bit southwest of where I got off the engine, straight across. They were a very little south, they were pretty near straight across west, almost west of where I got off the engine, and I think about a city block. The engine would have to go south and stop, and head in on the switch, and come north to get to that cut of cars. I judge that engine would have to travel about three blocks back to get to the switch, and after it had traveled that distance, then it would have to travel, just about that much further to get to the cut of cars. * * * There was nothing between the manure track and the cut of cars to interfere with the vision; you could see clear across; I could see the engine and everything. * * * I started across afoot to this cut of cars, the three cars, and walked up to the south car to see if the drawbar was open and see if the angle cock was open, and walked back to the next car and looked between to see if the air hose had been coupled up or the couplings were made, and walked back to the other car and done the same thing, and walked back to the end of the car to close the angle cock so the air wouldn't go through the train, and it would be ready to go back to town. I was fixing the cars so they would take the air when they were coupled. * * *

"When I got to the south end of the cut of cars, I remember looking at the drawbar and seeing if it was open, I don't know whether I opened it or not; it may have been open; and I looked at the angle cock to see if it was open. I had to step between the cars to couple the air hose; I coupled the air hose between the first and second cars, and I had to do the same thing all the way down the cut of cars. Then I went to the back of the cut of cars to see if the angle cock was closed or open here; if

it was open I would close it so the air wouldn't go through the train. I think the angle cock was open at the back of the cut of cars. That had to be closed. The air line is a long pipe running under a car, and here is the angle cock; it bends off the end of the car like this. A man has to get hold and shove it around. It is kind of like in a groove, and you have to lift it and shove it around. When the handle of the angle cock is crossways of the car, the air hose is closed, and when it is lengthways it is open. This angle cock is located right near the drawbar, and it was across the drawbar from where I was standing. I was coming north to the back end of this car, and that threw me on the right-hand side of the track, the east side of the track. In order to close this angle cock at the back end, I would have to walk up in the middle of the track and reach around the drawbar and cut it off. I walked down to the end of the car, and walked around the end to look at the angle cock, and reached over the drawbar to cut the angle cock off, and about that time they hit the car. I reached to get hold of the angle cock and turn it; it was turned straight, so the air wouldn't go through when they hit. When I say I cut the angle cock off, I mean I closed it, so the air can't pass through the pipe. This angle cock was on the west side of the drawbar, and they stand off about a half a foot from the drawbar. I was standing right in front of the drawbar, and had just reached over for it when they hit me. I was right in the middle of the track, middleways between the two rails, and I was standing within about a half a foot of the drawbar. That was a box car. * * * As to our custom and practice in actually doing the work—if I know a man is working under a cut of cars, I would never hit it until I saw that man and knew he was away from the cars and safe; that is the practice all over the yards, look out for each other, when you are moving cars around. * * * As foreman, I would lay out the work and tell them what to do. The engineer and fireman stay in the cab, and the man following the engine, the short field man, long field man, and foreman, each man has his place on the job. Any one can give a signal, if they see everything is all right and nobody around. If any member of the crew knows what is to be done, he can give a signal with reference to that work. Any signal that comes in his line, or under his observation, to be given, he would give it. If a man is at a cut of cars and gives a signal for the movement of the engine, he gives it to the engineer if he can see him; if not, to another switchman, who gives it to him. If I see the engineer, I give it to the engineer. Any member of the crew is supposed to repeat a signal when he sees it and thinks it necessary or proper to repeat it.

"When I went across to this cut of cars, it was my purpose to go over there and inspect the cars and line up the air on them and get them ready to take to town. I was in that work at the time I was hurt. Under the conditions there, where I was there lining up this cut of cars to be coupled onto by the engine, according to the customary way of doing the work, I would give the signal for the engine to come into the cut of cars. According to the usual and customary way of doing the work, the engineer, if he didn't see me, he would natur-ally stop. If some one didn't give him a signal to come ahead, the engineer wouldn't hit the cut of cars. It would not be usual and customary for him to run that engine into that cut of cars before receiving a signal from me. I think the short field man, McDowell, would be the man to give the signal to the engineer coming in on this forage track, about coupling into that cut of cars, providing he saw me and got a signal from me. I would give the first signal to come in and make the coupling, if I was all ready. It would not be customary for any of the crew to give a signal for that engine to come into that cut of cars before they received my signal to come. I would be the one to signal them to come into that cut of cars unless they seen me standing out away from them. I would give the signal for them to come in when I got my air lined up and work completed and stepped outside of the cars. Then I would give them a signal to come ahead, if they wanted to couple in. The engineer goes by signals, and it wouldn't be customary for him to come in before he got a signal from somebody. It wouldn't be customary for any member of the crew to give a signal before receiving my signal. The running into that cut of cars on the part of the engine was supposed to be initiated by a signal given by me first. On this occasion I had not given any signal for that engine to come into that cut of cars. So far as I know, nobody had given any signal to come into the cut. * * *"

Both the engineer and fireman testified they saw Andrews leave the engine when it was on the manure track and go in the direction of the three cars on the forage track. The engineer further testified that upon getting a back-up signal from Andrews on the manure track he backed to and beyond the switch; then upon sign from McDowell, who was riding the engine, he advanced and coupled onto the single car on the forage track. Then upon signal from McDowell he again went forward and coupled onto the string of three cars.

There is also evidence tending to show that the last coupling was made at an excessive speed, thereby causing the three cars to roll further than they would have rolled had the coupling been made by the engine moving at a proper speed; that the wheels would not have run over Andrews if the cars had rolled only as far as they should have rolled upon an impact at the speed the coupling should have been made. McDowell admitted the couplings were made by the engineer upon his signals.

The defendant answered by exceptions, general denial, and a special plea as follows:

"Further answering, if need be, defendant comes now and says that if plaintiff was injured, that his injuries were wholly proximately caused by his own negligence, or, if not wholly proximately caused by his own negligence, that his own negligence contributed thereto, in this, to wit: that the plaintiff knew the position of the cars in question, and knew that the engine was coming in on the side track or spur where the cars were located, and knew that the pur-

pose of the engine being propelled on said track was to couple onto said cars; and the plaintiff, with such knowledge, and with the knowledge that he had given orders as foreman for the engine to couple onto said cars and take them off of the spur track, went between the rails and immediately behind the end car, and was knocked down or injured by reason of the employees in the crew carrying out orders and instructions that the plaintiff himself had given; and the plaintiff, through his own negligence and carelessness and want of care, placed himself in a dangerous position in going immediately behind the cars that he knew were going to be coupled onto, and between the rails of the track upon which said cars were located, and upon which he knew said cars would move when the coupling was made; and the plaintiff was guilty of negligence in placing himself in an extrahazardous and dangerous position without exercising ordinary care for his own safety—all of which was negligence on the part of the plaintiff, which wholly proximately caused his injuries, if any, as aforesaid, or, in any event, approximately contributed thereto, all of which the defendant is ready to verify.

"And, further answering, if need be, defendant says that if plaintiff was injured, as he alleges, his injuries were the result of risks and dangers ordinarily incident to his employment, which he knew of, or which, in the exercise of ordinary care, he could have known of, which risks and dangers plaintiff assumed, the parties then being engaged in interstate commerce, but even if not, plaintiff assumed the risk."

In its general charge the court gave these instructions:

"9. Now, therefore, if you find from a preponderance of the evidence that on or about the 21st day of September, 1924, that in the making of a coupling of a car and switch engine operated by the employees of defendant with a cut of three cars plaintiff was knocked down and injured substantially in the manner alleged by him, and that the employees of defendant, before making said coupling, failed to stop and inspect to ascertain if plaintiff was in such proximity to said cut of cars as he might be injured by said coupling unless such inspection was made, and that such failure to stop and inspect as aforesaid was negligence, and that such negligence, if any, was the proximate cause of any of the injuries complained of in plaintiff's petition; or that the defendant's employees operating said engine in making the coupling drove the car attached to the engine against said cut of cars at an excessive rate of speed, and that in so doing it was guilty of negligence, and such negligence, if any, was a proximate cause of any of the injuries complained of by plaintiff, then your verdict will be in favor of the plaintiff, unless you find for the defendant on other issues submitted.

"10. Unless you find from a preponderance of the evidence that the defendant was guilty of negligence, your verdict will be in favor of the defendant; and if you find the defendant was guilty of negligence, unless you find from a preponderance of the evidence that such negligence, if any, was a proximate cause of some of the injuries complained of by plaintiff, your verdict will be likewise in favor of the defendant.

"11. If you find from the evidence that the injuries complained of by plaintiff were proximately caused by a risk or danger ordinarily incident to his employment, then your verdict will be in favor of the defendant."

Special charges, requested by defendant and given, read:

"No. 2. You are instructed that the only duty that rested upon defendant was to use ordinary care in the manner of doing the work to avoid injuring the plaintiff, and if the defendant, its servants, agents and employees used ordinary care in the way that the work was being done at the time of the injury there was no negligence. Now, therefore, if you believe that at the time of the injury the other employees used ordinary care in moving the cars in question at the time and in the manner they were moved you will find for the defendant."

No. 3. "You are instructed that if the plaintiff, Harry Andrews, failed to use ordinary care for his own safety in going between the tracks or rails and immediately behind or at the end of the car in question, he was guilty of negligence, and if his failure to use ordinary care wholly proximately caused his injury, he cannot recover, and your verdict will be for the defendant."

No. 4. "You are instructed that when the plaintiff, Harry Andrews, entered the employment of the defendant company, that thereafter in the discharge of his duty as such employee he assumed all of the ordinary risks and dangers incident to his employment and all dangers which he knew of or must necessarily have known of. You are therefore instructed that if you believe from the evidence that the plaintiff's injuries were due to risks and dangers incident to his employment as a switchman or to risks and dangers which he knew of or must necessarily have known of, then, in such event, if you so find you are instructed that plaintiff assumed the risks, and he cannot recover no matter what you may think on the other issues in the case."

No. 5. "You are instructed that if you believe the crew in question were instructed by the plaintiff, as foreman of such crew, to go down onto. the forage track and couple into the car which had been kicked on said track and the other three cars situated thereon, and that in doing said work of coupling onto said car they did so in the usual and customary way, and that plaintiff knew of the usual and customary way of doing said work, then, in such event, if you so find you are instructed that the plaintiff cannot recover, and your verdict will be for the defendant."

No. 8. "You are instructed that where there was a safe way for the plaintiff to perform his work and a dangerous way for him to perform it, it was his duty to exercise ordinary care to perform it in the safe way, and if he failed to exercise ordinary care to adopt the safe way, but adopted the dangerous way and knew and appreciated the dangers incident to the way in which he chose to do the work, he assumed the risk thereof and he cannot recover, and if you believe he did not adopt the safe way and knew and appreciated the dangers of the way in which he did the work, he cannot recover and your verdict will be for the defendant."

No. 11. "You are instructed that if you believe from the evidence that plaintiff did not tell McDowell or other members of the crew in question that he was going over to couple up the air hose, and you further believe from the evidence that the work of coupling up the cars by the crew was done in the usual and customary way of doing the work at the place in question, and that plaintiff knew of such usual and customary way, if it was such, and that the crew doing such coupling did not know or have reason to believe that plaintiff might be in a place of danger in proximity to said cut of cars, then in such event, if you so find, your verdict must be for the defendant."

The defendant requested and was refused a peremptory instruction in its favor. Other charges requested by it and refused read:

No. 6. "You are instructed that if you believe from the evidence that plaintiff did not inform McDowell that he was going over to the three cut of cars to couple up the air and that it was not usual and customary to couple up the air prior to coupling onto a cut of cars situated as the cut of cars were in question at the place in question, then, in such event, if you so find, you are instructed that the crew coupling onto the cars at plaintiff's direction were not required to anticipate that he was attempting to couple up the air if he was so trying to do."

No. 7. "You are instructed in this case that under the undisputed testimony plaintiff, Andrews, was the foreman of the crew and had authority over them and gave them instructions as to the manner of doing the work and movement of the cars, and you are further instructed that said Andrews directed the crew to go upon the forage track and couple up the cars, and you are further instructed that it was only the duty of those in charge of the engine and in charge of the work at the time to use ordinary care to avoid injuring any one. Now, if you believe from the evidence that the members of the crew, under said Andrews as foreman and acting under his instructions, went on the forage track and coupled up the cars and obeyed instructions given by him and in so doing used ordinary care in the manner in which the work was done, then you are instructed there was no negligence on the part of the defendant, its agents, servants, and employees and plaintiff cannot recover."

No. 9. "If you believe from the evidence that there was a safe way of coupling up the air hose, and that such safe way was waiting until the engine had coupled onto the cut of cars in question, and you further believe that to couple up the air hose prior to the engine coupling onto the cars in question was a dangerous way, and if you further believe from the evidence that the plaintiff knew and appreciated the dangers of doing the work in such a dangerous way, if it was dangerous, and he selected such dangerous way, then, in such event, if you so find, you are instructed that plaintiff assumed the risk of doing the work in a dangerous way, if he did so, and, if you so believe, your verdict will be for the defendant."

No. 10. "You are instructed that if you believe from the evidence that plaintiff did not tell McDowell or other members of the crew in question that he was going over to couple up the air hose, and you further believe from the evidence that the work of coupling up the cars by the crew was done in the usual and customary way of doing the work at the place in question, and that the plaintiff knew of such usual and customary way, if it was such, then, in such event, if you so find, your verdict must be for the defendant."

Our conclusions disposing of the various questions presented are as follows:

[1] 1. Appellants first complain of the refusal of its special charge No. 6. McDowell denied that Andrews told him he was going over to line up the air on the three cars, but in effect he admitted he knew he was over there somewhere. He testified:

"After Andrews told us to head in on the forage track and get those cars, I gave Spence a back-up signal, and I believe Andrews did, too. Harry and I were standing about the middle of the track, in front of the engine, when he told us to head in on the forage track and get those cars. I think Johnson was on the front running board. I stepped on the running board and left Harry standing there. As we pulled away, I didn't see Harry go in the direction of those cars we were to get, because my back was to him. I didn't look at him any more. As to whether I understood the 'we' to include him, when he said, 'We will get those cars,' I figured he would come back to town with us. He was foreman in charge of the work. When I gave the signal, and the engine started backing up, I knew Harry wasn't with us. I didn't see him going toward the string of cars— never did see him. I figured he was around there somewhere. That is open country; there is not a thing to obstruct the view. My back was to him all the way to where we were going to head in. When we threw the switch and came in on the forage track, my back was not still to him. As we went to the switch, we were backing up, and my face was looking at the head of the engine. I knew we left Harry standing there, and I didn't see him walking toward the string of cars. I supposed he was there somewhere. After he told us we would get the cars, I did not suppose he would go over there and do something to get the cars ready; the foreman didn't generally couple the air. As to my not having the slightest idea where he was or what he was doing, well; I figured he would come back before we went to town. The last time I saw Harry Andrews, before I saw him with his leg off, he was standing in the middle of the track after he told us we would get the cars. My back was to him until we headed in on the forage track, and I didn't see him at that time. I figured he would show up; he generally told us what to do. I didn't know where he was. I didn't search for him. When we pulled up and I didn't see him, I did not suppose he was between cars somewhere doing something; that was the last place I expected him. That was open country, and I didn't see him. I didn't know but what he was where I left him. I done what he instructed. No; I didn't expect him just to stay over there. When they tell you to do a piece of work, you do it and wait until they show up. As to my expecting to find him around the cars somewhere, well; he could

have been around them and not between them. * * *"

In our opinion the charge was properly refused for the reason stated in appellee's brief, as follows:

"Engineer Spence and Fireman Harrell admit they saw plaintiff going to the cut of cars. George Moore, acting foreman, saw plaintiff going to the cut of cars and supposed he was there lining them up, etc. While McDowell and Johnson deny that they saw plaintiff going toward the cut of cars, yet they had the best opportunity of all to have seen such fact, a matter in the plain view, and even if they did not use the slightest care as to the whereabouts of plaintiff, yet the jury were authorized to find that they did see him going to the cut of cars. Brown v. Griffin, 71 Tex. 654, 9 S. W. 546; Railway v. Finn (Tex. Civ. App.) 107 S. W. 94. They knew without being told that it was the natural thing that plaintiff would be lining up the cut of cars. They had no cause to believe he was elsewhere. They should have anticipated that he was probably there at least. This was all that was necessary to create liability, even though plaintiff had not told them where he was going. Railway v. Estes (Tex. Civ. App.) 203 S. W. 1155. It was not necessary that they knew he was there. It was negligence for them to signal the engine into the cut of cars and take the chances. The requested charge was opposed to this proposition and therefore was not the law. Plaintiff testified that it was as frequently done this way—that is, for one to go in and line up the cut of cars in advance of the engine coupling into them, as any other—therefore the other members of the crew should have anticipated his presence there without having been told by him, especially if he was seen going to the place and it was more probable that this was what he was doing than otherwise. Defendant's liability did not depend upon the arbitrary fact of whether plaintiff had by word of mouth told McDowell what he was going to do, as the requested charge would have the jury told.

"What the crew were required to anticipate as to plaintiff's whereabouts depended upon all of the facts and circumstances in evidence, and not upon the isolated fact of what plaintiff told or did not tell McDowell and whether it was customary to couple up the air before coupling the cars, as the requested charge would tell the jury. In that particular the charge was clearly upon the weight of the evidence."

[2-5] 2. Special charge No. 7 was properly refused, for the reason stated in appellee's brief as follows:

"The charge placed undue emphasis upon defendant's contentions, is argumentative and on the weight of the evidence, misleading and confusing. The first part of the charge tells the jury what the undisputed evidence shows as to authority and direction of plaintiff over the crew; then, without any relevancy to such statements, it couples onto them in an argumentative manner the general proposition, 'and you are further instructed that it was only the duty of those in charge of the engine and in charge of the work at the time to use ordinary care to avoid injuring any one,'. although this same proposition of law had already been stated to the jury twice in the court's main charge, paragraph 3, Tr. 14, and again in paragraph 10, Tr. 16, and again in defendant's special charge No. 2, Tr. 18. It is never proper for the court to repeatedly or unduly emphasize a particular issue.

"The charge was error in saying that plaintiff gave instructions to the crew as to the manner of doing the work and movement of the cars, in this that plaintiff did not at all times and places give such instructions as to manner of doing the work and movement of the cars; especially when plaintiff was not present with the engine and crew, for then other members of the crew gave directions as to manner of doing work and movement of cars, and such was the fact at the time of the injury, the plaintiff then being absent and the manner of doing the work and movement of the cars then and there being directed by other members of the crew, so that as applied to the immediate facts at the time and place of the injury, the charge was upon the weight of the evidence and its tendency was to mislead. For instance, in directing the crew to enter the forage track plaintiff did not direct them as to the speed the engine should hit the cut of cars, nor did he direct them as to whether they should see that plaintiff was in the clear before coupling, nor did plaintiff direct them as to whether or not they should signal the engine's approach. These were matters that were left to be done and observed by other members of the crew. The latter part of the charge submitting to the jury whether the crew 'obeyed the instructions given by him, plaintiff,' was improper, because the charge did not define such supposed instructions, but left such matter in doubt, and was error in that even though the crew obeyed plaintiff's instructions, yet if, in addition to the instructions and independently thereof and in a particular not covered by such instructions, they committed affirmative acts of negligence proximately causing plaintiff's injury, defendant is liable; while the latter part of the charge being the general instruction that if the crew used ordinary care in doing their work of coupling the cars the defendant would not be liable, had already three times been charged to the jury as shown above, and to have again charged it would not only have been submitting the defense in general terms only, but an undue emphasis of defendant's claim that the crew did use ordinary care and were free from negligence, leading the jury to infer that the court believed the crew had used care and were free from negligence. The court should not give undue emphasis to a particular issue or defense by repeating same in the charge. El Paso Electric Ry. v. Benjamin (Tex. Civ. App.) 202 S. W. 996; Kroeger v. Railway, 30 Tex. Civ. App. 87, 69 S. W. 809."

[6-8] 3. Special charge No. 9 was properly refused, for the reasons assigned by appellee as follows:

"(1) The court having already given defendant's special charge 8 submitting the same defense was not required to give its special charge 9 again submitting the same defense in a slight change of verbiage. Railway v. Haney (Tex. Civ. App.) 94 S. W. 386, Greenville v. Branch (Tex. Civ. App.) 152 S. W. 478.

"(2) The charge was misleading and not applicable to the facts in that plaintiff was not coupling up the air hose, and the assumption of fact in the charge to the contrary was not supported by the evidence, the fact being that plaintiff was behind the cut of cars closing the angle cock of the air hose, but not coupling up the air hose, coupling the air hose only being done between cars or between a car and the engine or tender."

"(3) The facts of this case do not raise the issue of selecting a dangerous way of doing work when there is a safe way, because either way was safe in the absence of negligence, but with negligence neither way was safe."

[9, 10] 4. Special charge No. 10 was properly refused for the reasons stated in appellee's brief, as follows:

"(1) The charge is error in making defendant's liability depend solely upon the fact of whether or not plaintiff told McDowell or other member of the crew that he was going over to the cut of cars to couple up the air hose, while under the evidence, even if plaintiff did not so state, yet the jury could have found that members of the crew saw plaintiff going to the cut of cars and should have known that plaintiff was working on the cut of cars lining them up in readiness to be coupled to the engine, and knew that plaintiff was probably in a place of danger and that they should not run the engine violently against the cut of cars without warning, even though plaintiff had not told them anything.

"(2) The charge is error in making the act of the crew a defense if the way of doing the work was the usual and customary way, because under the law liability existed if the crew acted negligently, even though the way might be usual and customary. Railway v. Walker, 58 Tex. Civ. App. 615, 125 S. W. 99; Morgan v. Railway, 50 Tex. Civ. App. 420, 110 S. W. 987; Railway v. Contois (Tex. Civ. App.) 279 S. W. 929.

"(3) The charge was misleading and away from the real issue in this, it makes the generality of the crew doing the work in the usual and customary way the real issue and as unconditionally constituting an absolute defense, while the law makes negligence vel non the real issue, leaving custom and usage as merely evidentiary. See authorities last above cited. The expression 'doing the work in the usual and customary way' is very general and liable to mislead the jury; the jury might think that such expression justified the crew in running the engine against the cars without warning and at a great speed even though the crew had reason to believe that plaintiff was behind the cars at work in a dangerous place. Besides, the main charge and special charges of defendant given by the court presented all of the defenses and the law to the jury more favorable to defendant than it was entitled to. Our objections and arguments to appellant's special charge No. 6, supra, are also applicable here."

[11] 5. The seventeenth and eighteenth propositions raise the point that there was no evidence authorizing the submission of the case to the jury. This is untenable. In support of the sufficiency of the evidence, we quote from appellee's brief, as follows:

"Plaintiff not only told the crew that he was going over to line up the air and get the cut of cars ready to couple onto and take to town, but the crew with their own eyes saw him going to the cut of cars and had every reason to believe that was what he was doing even without being told. They had no reason to believe there was anything else he could have been doing. Not only was it the custom that they should not bump into the cut of cars until they saw he was in a safe place and they had a signal from him, as testified by plaintiff, but even in the absence of such custom, common sense and a slight regard for a fellow employee required as much. As said by the court in Railway v. Reno (Tex. Civ. App.) 146 S. W. 210: 'Certainly, if the company's employees knew that he was charged with this duty, and had directed him to aid in setting out the furniture car, then they were charged with the duty of looking out for him before violently and suddenly running the engine and cars against the car upon which he was attempting to adjust the brake; and a failure so to do, it seems to us, under the facts disclosed by the record, would be negligence. It was not necessary that they should have actually seen him before this duty arose, because, having sent him there, the ordinary dictates of humanity, it seems to us, would have caused them to have ascertained whether he was in a position of peril before suddenly running into the car upon which he was standing, and a failure to so look was in itself negligence, irrespective of whether they saw him or not.' See, also, Railway v. Estes (Tex. Civ. App.) 203 S. W. 1155.

"It may be, as contended by defendant's counsel and some of its witnesses, that in its regular switch yards within its exclusive possession and control, where cars are being constantly switched from one track to another, every hour of the day and night, it is permissible to bump into a cut of cars without examination or warning unless protected by work flag, but certainly no such practice can be followed with safety on any outlying forage track, such as where this injury occurred, over which cars are seldom moved and where others besides the trainmen may rightfully be engaged in loading or unloading as well as for other purposes and where various obstructions may exist upon the track."

[12] 6. The remaining assignments and propositions assert that the damages awarded are grossly excessive and the verdict biased and prejudiced. So far as concerns the primary issue of liability vel non, the evidence amply supports the finding of the jury in favor of appellee. In the state of the evidence there is, in our opinion, no reason to assume that the finding made upon that issue was biased or prejudiced.

[13] We think, however, the damages awarded are excessive. No case in this state has been called to our attention where an award of $40,000 for the loss of a leg has been sustained, and as a condition of affirmance a remittitur of $10,000 will be required.

An award of $30,000 is higher than is usually allowed in such cases, but the evidence in this case warrants same. The plaintiff had worked for defendant 13 years. At the time he was injured was earning $205 per month, was 35 years of age past, in good health, industrious, never lost any time, weighed 145 pounds. He was six days at Beaumont Hospital, then taken charge of by defendant's doctor and taken to Hotel Dieu. Infection set up, causing temperature. Several minor operations were performed between that time and November 28th, on which date another major operation was necessary because of rotting flesh and failure of the wound to heal. At time of trial he had not been able to earn anything; has a very limited education; only went to the fifth grade in school; can't do any office work or mental work requiring education; still suffers great pain almost constantly; can't sleep more than three or four hours a night. The stub bone sticks out so exposed beyond the flesh, with no flesh cushion, as to be very sensitive and painful and a constant source of anxiety.

Dr. Stevenson testified:

"The length of the bone in the limb that is left here is about eight inches. There is no flesh whatsoever to form a cushion at the end of that bone, the bone is subcutaneous, that is, immediately under the skin, you can feel it very distinctly there. That makes it almost impossible to fit it to an artificial limb; an artificial limb cannot be worn on a stump of that kind; it is absolutely impossible, because, in the first place, the end of the bone is tender, there is not padding to protect the end of the bone, as is natural, and the superficial nerves are pressed upon by this point of bone. Where we can do it, in the amputation of a bone we aim to give as much padding, or we reserve as much tissue, which is composed of muscles, fat, and tendons, as possible, to go over that and make a natural padding. That relieves the tenderness and inability to use an artificial limb. Every inch you cut off of the point of the femur makes the possibility of an artificial limb lessened; that is, the shorter that stump is the more difficult it is to fit an artificial limb successfully. That stump, as it is now, is not a desirable stump for an artificial limb, on account of the shortness, for one thing, and on account of the exostosis of bone there, which is a protuberance of bone, which, in itself, acts against an artificial limb. Those stumps are always painful. As a rule a patient suffers pain from a lost limb of that kind. Of course, in each individual case I cannot say, but in an amputation of this kind there are many elements that enter into the future comfort of the patient. In the first place, on account of irritation from striking the end of the bone occasionally, and the ends of these different nerves, as for instance the larger nerve, the saphenous nerve, are incorporated in this scar tissue, and as time goes on the contraction of the scar pinches the end of the nerves nearly always. A patient ordinarily feels pain in that part of the limb that is lost on account of the irritation of the nerve in that part of the limb that is lost. The bone sticks out beyond the cushion, as it exists, at least an inch and a half or two inches, and the bone would have to be amputated three inches in order for a cushion to form there so that he could wear an artificial limb. As to whether I would advise that character of operation, as a surgeon, depends entirely upon his discomforts, there are apparently other elements entering into it, that exostosis, which should be removed, because without it being removed he is going to have a continual discomfort. Under ordinary conditions an operation of that kind would require an anesthetic; it might be done under local application, but he should be submitted to an anesthetic. That would not be a dangerous operation; all operations have a degree of danger, of course, but it would not be considered a dangerous operation from that standpoint. I am able to ascertain very little more information concerning that stump from these X-rays than from a physical examination. In the first place, I find the superficial condition of the bone to have some small exostosis of the bone, or protuberance of the bone."

In view of the facts shown respecting plaintiff's injuries, we think a remittitur of $10,000 is all that should be required.

Affirmed, upon condition that a remittitur of $10,000 be filed in 20 days. If not so filed the judgment is ordered reversed and remanded.

Affirmed conditionally.