## WICHITA FALLS, R. & FT. W. R. CO. v. COMBS. (No. 1453.)

(Court of Civil Appeals of Texas. El Paso. April 5, 1923. Rehearing Denied May 3, 1923.)

**1. Trial ⚫══258(1) — Requested instructions not signed by counsel held properly refused.**

Where special instructions requested by defendant were not signed by defendant or its counsel, the court did not err in refusing them.

**2. Trial ⚫══260(8)—Requested charge on injuries from accident held covered by instructions given.**

A requested charge that, if plaintiff was suffering from a tubercular condition or other health condition not caused by the injury, they should not consider such condition in arriving at their verdict, was sufficiently covered by a statement in the main charge not to consider any condition that did not proximately and naturally result from plaintiff's injuries.

**3. Master and servant ⚫══265(5)—Happening of accident carries no presumption of negligence.**

The fact of an accident carries with it no presumption of negligence on the part of employer, and it is an affirmative fact for the injured employee to establish that the employer has been guilty of negligence.

**4. Master and servant ⚫══278(6)—Evidence held to warrant finding automatic coupler was defective.**

Testimony by plaintiff, an injured railroad conductor, that the automatic coupler was defective and loose and out of alignment so that it would not couple, in connection with a testimony qualifying him as an expert, *held* sufficient to warrant the jury in finding the railroad, an interstate carrier, was negligent in permitting the use of a defective coupler.

**5. Damages ⚫══132(9)—$40,000 for loss of foot reduced to $25,000.**

A verdict awarding $40,000 damages for the loss of a foot of a railroad conductor *held* excessive and to be reduced to $25,000.

Appeal from District Court, Eastland County; E. A. Hill, Judge.

Action by Leslie Combs against the Wichita Falls, Ranger & Ft. Worth Railroad Company. Judgment for plaintiff, and defendant appeals. Affirmed on condition of remittitur.

John B. Howard, of Pecos, Conner & McRae, of Eastland, Levy & Evans, of Fort Worth, and R. E. Taylor, of Wichita Falls, and Thompson, Barwise, Wharton & Hiner, of Fort Worth, for appellant.

Randell & Randell, of Sherman, and Ocie Speer, of Fort Worth, for appellee.

HARPER, C. J. Appellee brought this suit against the appellant for damages arising from personal injuries inflicted upon him by reason of a defective automatic coupler, alleged to have occurred in the following manner, to wit: That appellant was engaged in operating a line of railway as a common carrier; that appellee was employed as a conductor, with the duty of assisting in switching and coupling cars; that while so engaged at the time and place of the injury the track was rough and uneven. The drawheads of the coupler were old, worn, defective, out of place, etc., and it became necessary for him to use his left foot in between the cars and against the drawhead of said coupler in order to make the coupling; and that in so doing his foot was caught between the drawheads and crushed.

Appellant answered by general denial, and specially pleaded that the coupler and drawheads were in the condition required by the federal statute.

The cause was submitted upon general charge and verdict and judgment for $40,000, from which an appeal is perfected.

[1] Propositions 1 to 5, inclusive, complain of the refusal of special requested instructions. The instructions were not signed by appellant or its counsel; for that reason the court did not err in refusing same. First National Bank of Snyder v. Patterson (Tex. Civ. App.) 185 S. W. 1018.

[2] The sixth complains of the refusal to submit the following special instruction:

"Gentlemen of the jury, in this case you are instructed that if you find and believe from the testimony introduced before you that the plaintiff is suffering from a tubercular condition, or from any other health condition not caused by the injury of the plaintiff as alleged, then you are instructed not to take into consideration such condition in arriving at your verdict. In this connection you are further instructed that if you find and believe from the evidence that the loss of strength, if any, by the plaintiff, or the loss of weight, if any, or the loss of appetite, or the proper lack of digestion, was not due to directly or caused by the injury of the plaintiff, as alleged in his petition, then you are instructed that you will not consider such conditions and such ailments in arriving at your verdict."

And the seventh proposition is to the same effect.

These propositions were sufficiently covered by the main charge, which contains the following:

"But you will not consider any physical pain, lessened capacity, condition or result whatever that did not proximately and naturally result from plaintiff's said injuries."

The eighth complains of the refusal of a special charge to the effect that the burden of proof was upon the plaintiff to prove by a preponderance of the evidence that the car or cars were not equipped with a coupler that will couple automatically by impact, as required by the Federal Safety Appliance

Act (U. S. Comp. St. § 8606), and that such failure, if any, was the proximate cause of the injury complained of. The main charge correctly submitted this issue.

It is next contended that the verdict of the jury and the judgment of the court should have been set aside because against the great weight and preponderance of the evidence.

[3] The fact of an accident carries with it no presumption of negligence on the part of the employer, and it is an affirmative fact for the injured employee to establish that the employer has been guilty of negligence. Texas & Pacific Ry. Co. v. Barrett, 166 U. S. 617, 17 Sup. Ct. 707, 41 L. Ed. 1136.

[4] The appellee testified, who qualified as an expert:

"I met with an accident while I was engaged in that work. * * * To explain to the jury so they will understand what I was doing there, I was switching out material, and this pipe to be carried from Frankell to Breckwalker, and this pipe could be moved over on the tracks so I could get room—the cars had to be moved to move the pipe, * * * and I had to leave Ranger at 5 o'clock in the morning to get to Frankell to switch out this material and get to Breckwalker to get my construction crew and construction force to work by 7 o'clock, which would require us to get to Breckwalker with this material and get my men and bring them back a couple of miles or three, this side of Breckwalker, to tie up the track. Some of the material at Breckwalker—in coupling into these cars there was one cut of cars six or eight, in one cut, and down probably 100 yards was another cut of cars, and down to the lower end of this long track was the third cut of cars. The Frankell yard is about 1 per cent. grade, and for about three miles down the hill, it is 1¼ per cent. grade, where if a car gets away from you— I coupled up this track to get this material. I had about six or eight cars in the first cut—probably ten. I failed to see how many there were. The last car in this cut was a car of pipe in question and was possibly 50 or 100 yards space between that and the other cars, and as the engine had one brakeman and I had him out to one side passing signals from the engine to me, I had to pass signals to him in coupling—to him, and he to the engineer. The coupling I made was on a straight track, about two cars lengths inside the straight track, or more, and in following this down, the knuckle was open on this moving car, but was closed on the standing car, and in following this down to get to this coupling, in approaching it, real close, I discovered to my belief and knowledge and experience that the knuckle would not enter, and that this knuckle would not enter this other drawbar to couple unless it was aligned. I gave a stop signal to my brakeman, which would be transmitted to the engineer; but as the train didn't stop, and they were going to strike anyway, just before they came together I put my foot against the outside of this moving drawbar and attempted to shove it over so the knuckle would pass in this other knuckle, and make this coupling, and as I shoved this over as far as it would go, they struck and wouldn't couple. Instead of striking in this space between this knuckle and this drawbar for this knuckle to go in, they struck about three inches back of the face of this knuckle. This knuckle necessarily closed with a great rush with the pressure of the train behind it. When it went in, it went in with a great jerk. As the knuckle closed and the pressure came together on these drawbars, it forced this drawbar back that the knuckles passed each other. I stated that the knuckle on the moving car struck the knuckle on the standing car and it passed on, going by it, struck it, closing it. And that in going in that forced it back with a jar. * * *

"I endeavored to make the coupling when I saw, and it was my belief, that the coupling would not couple without being aligned. I tried to align them to make the coupling, as it was on the grade, and it was necessary to make this coupling, and I was making every effort to make it, and the only way I could do that was to shove it with my foot, as I couldn't go between them to shove it with my hand, and the logical way would be to shove it with the foot and get it far enough so the knuckle would make a coupling, and, as stated before, after I shoved this one coupler as far as I could shove it, a moment before it struck, it struck and struck three inches behind the face of the knuckle, closing this and catching my foot between the outer face of this drawbar and against the face of the standing car closed knuckle about three inches from the edge of this. This drawbar caught against the face of that knuckle, against the face on this side (indicating) * * * at the time I first placed it on the drawhead. It was approximately three or four inches from this drawbar, from the end of the drawbar. As to how it came to get between the drawbars, the shock of this coupling—this knuckle not catching—this shock and impact made a jar on this drawbar I had my foot on, and as it gave way with the shock and the force behind it, it jarred my foot loose, and it went to the end as I was pushing. The force of my pushing when it dropped loose dropped that foot between, and as the knuckle passed, instead of remaining face to face as they passed sideways, it let this drawbar come up against the face of that knuckle with my foot between it and cut it off. If the moving knuckle had not struck the standing knuckle, or the knuckle on the moving car, if it had been far enough to have coupled by impact, that absolutely could not have hurt my foot; there was no chance. As to what it would have done with reference to coupling, it would have made the coupling. It did not make the coupling. Later on, I observed the condition of the drawhead there, when I got hurt. After I got released from the car, I had my brakeman to signal the engineer ahead. I had the train to move forward to release my foot. I gave a go-ahead signal to the brakeman to have the train go ahead to release my foot, which the brakeman had to transmit to the engineer. That was done and I was released. I noticed what the condition of the drawheads were there. As to the conditions of this coupling as I obsberved it just after the accident, the coupling on the car that was standing still, it was an old wooden framed car, with wooden underframe, wooden draft timbers. It was, of course, old and worn and out of line. The

drawbars had lots of side motion in them. The bar was loose and sagged. The draft timbers were worn, and there was lots of side motion in this drawbar—so much so that when the impact was made, the knuckle came across the face or the edge, and in coupling this drawbar and coupling closing, instead of opening, it came on this knuckle three inches. The draft timbers were worn. They had been strained in use, necessarily, and in a kind of rattley condition, rattley shape, loose and out of alignment. That left the drawbar out of line for several inches, which necessitated, as a general thing, the disalignment of those things which should couple with the drawbar. I say that I have been in the railroad business, and was conductor, etc., something like 25 years. I am familiar with the coupling and uncoupling of cars. And the drawheads and their condition, etc. When I shoved that drawhead with my foot, my purpose was to couple the cars. At that time it appeared to me that they were out of alignment. It occurred to me that by shoving the drawhead I could make the coupling. That was usual practice. That was the proper way and only practical way. It would not have coupled by impact if I had not interfered with it. I know that to be a fact. As to how far I shoved that drawhead that I pushed in this way, I shoved it as far as it would go. Having shoved it as far as I could, I judge it lacked about three inches of getting to the point where it could pass and make the coupling. So that shoving it as far as it would go, it still lacked three inches of making the coupling by impact. And the drawhead, I say, had a great lateral motion or play and was hanging down, was on the standing car. I said something about some iron that was loose or broken, that was the carrier iron. The carrier iron is a straight iron underneath right at the neck of the drawbar that the drawbar rests on as it comes out of the draft timbers. The carrier iron is what the drawbar rests on. That was loose and sagged. Not to a great extent, but was loose and sagged. That is held up by the draft timbers."

It is agreed that the company's train was engaged in interstate commerce at the time.

We are of the opinion that the evidence is sufficient. A similar case upon the facts is San Antonio & A. P. Ry. Co. v. Wagner (Tex. Civ. App.) 166 S. W. 24, affirmed 241 U. S. 476, 36 Sup. Ct. 626, 60 L. Ed. 1110. Atlantic City R. R. Co. v. Parker, 242 U. S. 56, 37 Sup. Ct. 69, 61 L. Ed. 150.

Under 9, the remarks of counsel were not reversible error under the facts.

[5] The eleventh and twelfth complain of excessive verdict.

We have concluded that, from the character of the injury, a verdict for $25,000 will liberally compensate appellee.

If appellee will, within 20 days, enter a remittitur for all over this amount, the judgment will be affirmed for said amount and costs of the trial court; otherwise it will be reversed and the cause remanded. Costs of appeal will be taxed against appellee. Article 1631, Revised Civil Statutes of Texas.