BERNARD J. CURRAN, APPELLEE, v. UNION STOCK YARDS COMPANY, APPELLANT.

FILED NOVEMBER 26, 1923. No. 22561.

1. **Negligence:** CONTRIBUTORY NEGLIGENCE: DAMAGES. Where negligence of defendant is shown as the cause of an accident, contributory negligence of plaintiff is not a complete defense, but only calls for an apportionment of the damages under the federal employers' liability act, 35 U. S. St. at Large, ch. 149, sec. 3.

2. **Master and Servant:** ASSUMPTION OF RISK. Under section 4 of the federal employers' liability act, an employee assumes the risks incident to his employment, and risks due to negligence of the employer and his agents and servants, when such risks are obvious or are fully known and appreciated by him.

3. ———: ———: QUESTION FOR JURY. Where reasonable minds might differ upon the subject, the question of assumption of risk is one of fact for the jury.

4. ———: DEFECTS IN EQUIPMENT: QUESTION FOR JURY. Whether or not a defect caused by negligence of the defendant is of such an obvious character that the employee should have known of it is a question for the jury, where reasonable minds might differ upon it.

5. **Damages:** REMITTITUR. A verdict for $32,000 for personal injuries sustained by a railroad switchman 49 years of age, under the facts, *held* excessive, and a remittitur of $10,000 ordered.

APPEAL from the district court for Douglas county: CARROLL O. STAUFFER, JUDGE. *Affirmed on condition.*

*Brown, Baxter & Van Dusen,* for appellant.

*John M. Macfarland* and *Gray & Brumbaugh, contra.*

Heard before MORRISSEY, C. J., LETTON, ROSE, DEAN and GOOD, JJ., REDICK, District Judge.

REDICK, District Judge.

This action is brought under the federal employers' liability act to recover damages for personal injury to the plaintiff, and the facts disclosed by the evidence are substantially as follows: The defendant, in connection with extensive stock-yards, operates a railroad and is a common carrier. The plaintiff had been engaged in railroading as a switchman for about 28 years, the last 14 of which were with the defendant, and the last 3 in and about the place in the yard where he was injured. At the time of the accident a string of 15 empty freight cars were standing at one of the docks or platforms in the stock-yards at which cattle were unloaded. The platform extended to within 5 or 6 inches of the side of the freight car when standing upon the track, and was 10 or 12 feet in width, presenting

Curran v. Union Stock Yards Co.

a clear space between the cars and the fencing inclosing the stock-yards, except for wooden bridges composed of two-inch planks used to cover the space between the dock and the car when cattle were being loaded or unloaded, and which would be left lying upon the dock. The dock was about 900 feet long and accomodated 24 chutes about 40 feet apart. The alley-ways or chutes through which the cattle passed from the pens to the cars were provided with gates the width of the platform, which, when opened across the platform, completed the chute to the door of the car. When not in use and after a car was unloaded, these gates were swung back to the right and left against the inclosure of the cattle pens, an iron pin being provided to keep them in place. It was the duty of the chute gang of the defendant, after each car was unloaded, to swing these gates back into position indicated and lock them with the pin. At the time of the accident resulting in the injury to the plaintiff, one member of a pair of these gates was standing open across the dock, the outer end of it reaching within a few inches of the side of passing cars. The pin above referred to was also used for fastening the gate in position when being as part of the chute, but whether it was engaged at the time of the accident is not shown by any direct evidence. The engine was headed north, and the operation being performed at the time of the accident was to push the string of cars north past the loading platform to the Northwestern Railway tracks, the engine being located at about opposite chute No. 1. The plaintiff was standing on top of the box car immediately north of the engine, and facing north during the movement, watching for signals from a switchman on top of the train at the other end in order that he might repeat them to the engineer. When the car upon which plaintiff was riding was about opposite chute No. 18 or No. 20, plaintiff received a signal to cut off the cars from the engine and kick them onto a switch, which signal he repeated to the engineer, and immediately walked to the southwest corner of the car upon which he was riding, and turned around and started to climb down the side ladder

thereon. The engineer, upon observing the plaintiff and having seen the gate extending across the dock, holloed to the plaintiff, applied the air brake, and blew his whistle, but the plaintiff did not hear, and when he was about half-way down the ladder with his head and shoulders about even with the top of the car, he was struck by the gate and thrown down between the engine and the car, one wheel of which ran over his foot, mashing it to such an extent as to require amputation of the leg below the knee. The car was provided with two ladders, one on the side with a stirrup extension, and the other just around the corner on the end. The instructions to all switchmen and the universal custom was to use the end ladder in "close quarters;" under other conditions either ladder might be used. The position of the gate across the dock was seen by the engineer at the commencement of the movement, and could have been seen by the plaintiff from his position on top of the car had he looked in that direction.

The theory of the plaintiff is that defendant's servants whose duty it was to close the gates back upon the inclosure of the pens were negligent in leaving the gate in question in the position it occupied at the time of the accident, and that such negligence was the proximate cause of his injuries.

The defendant by its answer presents three defenses: (1) That the proximate cause of the accident was plaintiff's own negligence in using the side ladder on the car; (2) that plaintiff was on the side ladder in violation of the instructions of the defendant and of the custom of switchmen in the use of side ladders in close quarters; and (3) that the injuries received by plaintiff were the result of the risks of his employment and assumed by him. The case was presented to a jury under appropriate instructions, to which no objection is made, resulting in a verdict for the plaintiff for $32,000, upon which judgment was rendered, and, motion for a new trial having been overruled, defendant presents the case here for review.

We need not consider at any length the question of negligence of defendant. That was for the jury, and their find-

ing is abundantly sustained.   But, in addition to this, counsel for defendant not only fails to discuss it in his brief, but upon the argument, with great fairness, assumes the existence of negligence.   Negligence of defendant being established, contributory negligence of plaintiff would not be a complete defense, but would only call for an apportionment of the damages under the federal employers' liability law.

On the question of violation of general instructions and the custom of switchmen, we do not think the rule or custom was of such a positive or definite character as to make the violation thereof a question of law.   It was to operate only ·in "close quarters," and whether or not the operation being carried out presented a situation for the application of the rule presents a question of fact for the jury, and was such in this case.   The movement of trains past the unloading docks was a usual movement, and if there were no obstructions upon the dock, the evidence seems to show that it was as safe to go down the side ladder as the end ladder. The plaintiff testified that he intended to remain upon the ladder until he had passed the loading dock.   This he could do with perfect safety.   The first and second defenses presented questions for the jury, and their finding thereon, being supported by the evidence, is binding upon this court.

The defense principally relied upon is assumption of risk; that the defect or condition causing the injury was of such an obvious character that plaintiff, in the exercise of ordinary care, should have known of its existence, and is therefore chargeable with such knowledge, and yet selected the dangerous way, when a safe one was provided.   The evidence shows that occasionally gates will jar loose and obstruct the dock.   It does not warrant an inference that such was the cause in the present case.   But the conditions shown were not of such general occurrence as to bring it within the rule as being a usual and ordinary risk of the employment.

The common-law rule of assumption of risk is in full force in federal jurisdictions, except in cases in which the rule

is abrogated by section 4 of the federal employers' liability act, viz., "where the violation by such common carrier of any statute enacted for the safety of employees contributed to the injury or death," such, for instance, as the providing of automatic couplers.

We do not understand the learned counsel for defendant to contend that in all cases not within the language of section 4 assumption of risk is a complete defense; though they cite *Seaboard Air Line Ry. v. Horton,* 233 U. S. 492, holding: "The employers' liability act having expressly eliminated the defense of assumption of risk in certain specified cases, the intent of congress is plain that in all other cases such assumption shall have its former effect as a bar to an action by the injured employee"—and *Boldt v. Pennsylvania R. Co.* 245 U. S. 441, approving that case. The manifest meaning of the clause quoted is that the rule shall remain a bar in those cases where it would have been a bar at common law. In fact, the first syllabus in the *Boldt* case states the rule as follows:

"Under the federal employers liability act, except in the cases specified in section 4, the employee assumes extraordinary risks incident to his employment, and risks due to negligence of employer and fellow employees, when obvious or fully known and appreciated by him."

It is evident that the extraordinary risks referred to are not risks due to negligence, but such risks as are incident to extra hazardous, as compared with other employments; and that risk of negligence of the master is only assumed when such negligence is obvious or known and appreciated.

The *Horton* case is to that effect. Horton, an engineer, was injured by the bursting of a water guage which was not protected by a guard glass which was a part of the regular equipment. The guard had been furnished, but was removed by the fireman to be cleaned. Its absence was obvious and known to the engineer, and he was held to have assumed the risk. The court said (p. 504) : "Some employments are necessarily fraught with danger to the workman—danger that must be and is confronted in the line of

his duty.  Such dangers as are normally and necessarily incident to the occupation are presumably taken into account in fixing the rate of wages.  And a workman of mature years is taken to assume risks of this sort, whether he is actually aware of them or not.  But risks of another sort, not naturally incident to the occupation, may arise out of the failure of the employer to exercise due care with respect to providing a safe place of work and suitable and safe appliances for the work.  These the employee is not treated as assuming until he becomes aware of the defect or disrepair and of the risk arising from it, unless defect and risk alike are so obvious that an ordinarily prudent person under the circumstances would have observed and appreciated them.  These distinctions have been recognized and applied in numerous decisions of this court,"—citing cases.

The following cases cited by appellant are not applicable, because the alleged defects were permanent conditions of which the employee was required to take notice:  *Schultheis v. United Railways Co.*, 236 S. W. (Mo.) 54, an iron post near the track; *Tuttle v. Detroit G. H. & M. R. Co.*, 122 U. S. 189, sharp curves in the tracks in railroad yards; *Choctaw O. & G. R. Co. v. McDade*, 191 U. S. 64, the existence of a water tank close to the track; *Central V. R. Co. v. Bethune*, 206 Fed. 868, tracks too close together; *Southern P. Co. v. Berkshire*, 254 U. S. 415, mail crane close to the track.  Other cases cited are where conditions were constant or of long standing, *Butler v. Frazee*, 211 U. S. 459; *American Car & Foundry Co. v. Allen*, 264 Fed. 647; or use of tools obviously defective, *Pryor v. Williams*, 254 U. S. 43; or the ordinary conditions incident to the occupation, *Swasey v. Maine C. R. Co.*, 115 Me. 215; *Reed v. Director General*, 267 Pa. St. 86.  Such cases are not in point.

*Kirbo v. Southern R. Co.*, 16 Ga. App. 49, is cited.  It was there held that plaintiff assumed the risk of injury resulting from neglect of the master to keep its electric lighting system in proper condition so as to furnish the usual and necessary amount of light—an obvious defect.

*Union P. R. Co. v. Marone,* 246 Fed. 916, is specially re-
lied upon. Plaintiff was ordered to cut some rails. He
asked the foreman for something to protect his eyes as he
had the other day received a piece of steel in his wrist. The
defendant had provided suitable goggles for the purpose,
but the foreman said, "Go on, that's all right; we never use
them." Plaintiff, "because he was scared to lose his job,"
proceeded with the work, and a piece of steel was driven
into his eye. It was held he assumed the risk. To make
this case applicable, we would have to assume that Curran
saw, or should have seen, the gate and assumed the risk of
riding on the side ladder. This we cannot do, as shown later.
This case is also cited in connection with *Swasey v. Maine
C. R. Co., supra,* to the proposition that where there are
two methods of doing an act, one safe and the other danger-
ous, and both methods are known to the employee, he is
bound to use the safe method. This involves the same as-
sumption just referred to.

From general principles and the cases cited, we think the
rule may be safely stated to be that whether or not the de-
fect due to the negligence of the master is of such an ob-
vious character that the employee should have become aware
of it in time to avoid injury, and therefore assumed the
risk, is a question of fact for the jury in all cases where
reasonable minds might differ.

In the instant case, while plaintiff might have seen the
gate from his position on the car facing north, his duties
required him to watch the switchman on the other end
for signals and repeat them to the engineer. This situation
continued until he was opposite chute 18 or 20, when he
turned around to the south and west and started down the
ladder facing east and looking down where he was going.
We are, under the conditions, unwilling to hold as a mat-
ter of law that he should have seen the gate. That he did
not see it is conceded. The question was for the jury.

Defendant strenuously objects that the damages allowed
by the jury are so grossly excessive as to impeach the in-
tegrity of the verdict, requiring a reversal upon that ground,

rather than a remittitur. In substance the evidence shows that plaintiff's leg was amputated above the ankle; that the covering of the tibia consists only of scar and skin, and furnishes an insufficient cushion for the support of an artificial leg, so that plaintiff suffers pain when standing. The trial was about one year after the amputation, and the attending physician gives it as his opinion a second amputation will be necessary to insure a sufficient covering for the end of the bone. Plaintiff suffered great pain, was in the hospital five weeks, and in his home three or four months. He claims his back and shoulders were badly hurt; cannot do any lifting; experiences nervousness at times; pains him when he stands or walks very much; is unable to do any work. At the time of his injury he was earning $195 a month, and was 49 years old, with an expectancy of 22 years.

The damages are for the determination of the jury, and it is with the greatest reluctance the courts will, in a manner, substitute their judgment for that of the jury. The record before us warrants no inference that the jury was so influenced by passion and prejudice as to require a reversal on that account. The verdict, however, does appear to be excessive. Defendant cites a great many cases where judgments have been reduced as excessive—seventeen were for the loss of a leg, for which the average allowance was $9,500; but it must be conceded that each case must depend upon its own facts, and the loss to plaintiff is aggravated by the fact that the experience of 28 years as a switchman has been rendered valueless, and a second operation probably required.

We have considered most carefully all the circumstances and the arguments of plaintiff's counsel, and have reached the conclusion that the judgment should be reduced to $22,000. If plaintiff, within 20 days, files a remittitur of $10,000, the judgment will be affirmed; otherwise, it is reversed and remanded.

AFFIRMED ON CONDITION.