204 P.2d 1050

**ALABAM FREIGHT LINES et al. v. THEVENOT.**

No. 5092.

Supreme Court of Arizona.
March 2, 1949.
On Rehearing March 14, 1949.

UDALL, J., and LaPRADE, C. J., dissenting.

Kramer, Morrison, Roche & Perry, of Phoenix, for appellants.

Jennings, Strouss, Salmon & Trask, J. A. Riggins, Jr., Henry S. Stevens and Burr Sutter, all of Phoenix, for appellee.

STANFORD, Justice.

Plaintiff (appellee) brought this action against the defendants (appellants) in the Superior Court to recover for personal injuries and property damage resulting from a collision caused by the negligence of the defendants.

Defendants admitted their liability leaving for the determination of the jury only the amount that plaintiff should recover.

The personal injuries resulted in a permanent partial disability of the plaintiff, who was then a man of the age of twenty-six years, having a wife and small daughter.

For thirty days immediately prior to the accident the net earnings of the plaintiff were $380. Plaintiff commenced the business of trucking in January, 1946, when he received a certificate of convenience and necessity from the Arizona Corporation Commission permitting him to engage in the trucking business.

On July 9, 1946, he was engaged in hauling cull cantaloupes from a packing shed on Grand Avenue in Maricopa County, Arizona. At about three o'clock in the afternoon he had loaded his truck with cantaloupes, and had driven out onto Grand Avenue and started toward the City of Phoenix. While on the right-hand side of the highway his truck was struck from the rear by a truck and semi-trailer of the defendant Alabam Freight Lines. The testimony shows that the truck of the defendant Alabam Freight Lines was traveling at a speed of about forty-five miles per hour at the time of the impact and that there was no slackening of speed prior to the same. Plaintiff's loaded truck was knocked some sixty feet and overturned with all four wheels in the air.

In addition to cuts and bruises all over the body of plaintiff, his left foot was badly mangled and crushed. A portion of the said foot was amputated. A second operation was required on September 3, 1946. In this operation plastic surgery was performed, skin being taken from plaintiff's thigh and grafted on to the wounded area. Some thirty areas of skin were thus transplanted. Plaintiff remained in the hospital from the date of the injury until September 25, 1946, and was continually under the care of a doctor until September 15, 1947. An artificial limb was recommended and obtained, but, because of the nature of

the injury, the plaintiff could not bear his weight upon the stump without causing ulcerations at the place of amputation. It will be necessary hereafter to perform another operation and amputate the remaining portion of the foot and ankle except for the flap of the heel which, if sufficient, will be pulled over the stump of the bone to provide a weight-bearing pad. If this is not possible, the entire lower leg will have to be amputated at a point approximately six inches below the knee. Under the testimony it will require from three to six months following this operation before plaintiff can again be able to work.

The case was tried before a jury and a unanimous verdict was rendered in behalf of plaintiff in the sum of $55,000 for personal injury and $1,000 for damage to plaintiff's truck. After judgment was entered on the verdict, a motion for new trial was filed by defendants which was denied by the trial court on condition, however, that the judgment be remitted to $46,282.96, which remittitur was led by the defendants pursuant to the court's order. This appeal was taken from the judgment and order denying the motion for new trial.

The three assignments of error submitted by the defendants are embodied in the proposition of law as follows:

"Where damages awarded for personal injury are excessive and appear to have been given by the jury under the influence of passion or prejudice, a new trial should be ordered or the verdict reduced to a reasonable amount."

In their argument defendants first rely on the rule in the case of Standard Oil Co. of Calif. v. Shields, 58 Ariz. 239, 119 P.2d 116, 119, in support of their contention. We quote from that case which is one of Arizona's leading cases on the subject of excessive damages:

"* * * She bases her argument on this point on the proposition that passion and prejudice can only appear when (a) improper evidence was admitted upon which the jury might have acted, (b) improper instructions of law were given which might have misled the jury, (c) the argument of counsel was outside the record and of such a nature as might have been calculated to arouse the prejudice of the jury, and (d) there is proof of some misconduct on the part of the jury, and that if none of these matters appear from the record, the court may not set aside a verdict on this ground. Any one of the causes mentioned by plaintiff would be sufficient, of course, to authorize an appellate court to presume passion and prejudice, but we think she has omitted a fifth ground, which is, when the amount of the verdict as compared with the legal damages shown by the evidence is so great as to shock the conscience of the appellate court. * * *

"The damages permissible in a case of this nature may be divided legally into three classes, (a) out of pocket expenses for past and prospective medical and other items

rendered necessary by the accident, and damage to plaintiff's automobile. These may be calculated with reasonable certainty; (b) loss of earning power by reason of injury, which may be calculated on an evidentiary basis, although not always with the same certainty as the first class; and (c) pain and suffering, past and prospective. This last, of course, is an item for which no definite rule of estimation may be given and, therefore, a great amount of discretion may, and properly should, be left to the jury. But even here we think there is a limit. It is often said in argument on this point, 'For how much would a man be willing to suffer the same injuries as those which plaintiff has suffered.' This, of course, is not a proper test of legal damages. No man in his senses would accept any sum to undergo voluntarily the pain and suffering caused by many of the injuries which appear in negligence cases, and yet a verdict for pain and suffering, past and prospective, caused by such an injury might well be so excessive that we would be compelled to state it was based on sympathy for the victim and prejudice against the defendant, rather than a reasonable and dispassionate consideration of the whole situation."

Our comment here is that certainly within a nation that has its times of war; its times of depressions; and, its times of prosperity, it would seem impossible to fix a measuring rod by which damages in cases of this nature could be measured.

Defendants have cited many cases where excessive verdicts for the loss of a foot were given. Among them are: Cole v. St. Louis-San Francisco Ry. Co., 332 Mo. 999, 61 S.W.2d 344; Bassett v. Milwaukee Northern Ry. Co., 169 Wis. 152, 170 N.W. 944; Kurn v. Campbell, 188 Okl. 636, 112 P.2d 386; Otos v. Great Northern Ry. Co., 128 Minn. 283, 150 N.W. 922; Galveston etc. R. Co. v. Andrews, Tex.Civ.App., 291 S.W. 590; Grennon v. New Orleans Public Service, Inc., 10 La.App. 641, 120 So. 801; Atlantic Coast Line R. Co. v. Kinlaw, 117 Fla. 166, 157 So. 341; Wichita Falls etc. Co. v. Combs, Tex.Civ.App., 250 S.W. 714; Curran v. Union Stockyards Co., 111 Neb. 251, 196 N.W. 135; White v. Davis, 103 Cal.App. 531, 284 P. 1086; Reed v. Terminal R. Ass'n of St. Louis, Mo.Sup., 62 S.W.2d 747.

The trial court has already made a substantial deduction by required remittitur. In its order the court stated:

"In ordering a remitter herein the court has taken into consideration that there is presently a substantial decrease of purchasing power of the dollar.

"The plaintiff's medical expense, damage to truck, and loss of earnings for twenty-four months following date of injury add up to $9,282.96. The jurors had these figures before them in assessing damages at $56,-000.00. If the jury considered this sum as special damages in arriving at its verdict, the general damages assessed would be $46,717.04. To bring the verdict in

this case in line with verdicts rendered and sustained in similar cases, not only in this state but also in other jurisdictions, the court is of the opinion that the verdict is excessive in the amount of $9,717.04. If the verdict is reduced in this amount, after compensating plaintiff for his actual damages, it will pay him $1,000.00 a year during his life expectancy, 37 years, for pain and suffering and future loss of earnings."

In support of the view that the verdict is not excessive under present inflationary conditions we quote for the reasoning therein only from Armentrout v. Virginian Ry. Co., D.C., 72 F.Supp. 997, 1001:

" * * * They need not close their eyes to the economic facts of life. It is possible, of course, that values may cease to be affected by inflation of the currency. Economic conditions may conceivably cause the value of the dollar again to rise to the point where it stood before the World War II. On the other hand, there is no assurance that its value may not become less as time goes on. This possibility balances, if it does not outweigh, the contrary forecast. * * *"

This case, however, was reversed in 4 Cir., 166 F.2d 400, but its reasoning is sound. For other cases where very substantial judgments have been affirmed, we quote the following:

Greenberg v. Garfield-Passaic Bus Company, 1946, 134 N.J.L. 371, 48 A.2d 389; $85,000 for amputation of both legs of 55 year old housewife.

Beam v. Baltimore & O. Railway, 1945, 77 Ohio App. 419, 68 N.E.2d 159; $75,000 for loss of both legs of brakeman earning $280 per month with life expectancy of 25 years.

Bosher v. International Railway, D.C. 1926, 15 F.2d 388; $45,000 for amputation of one leg and injury to other leg of 39 year old man with annual income of $1,385.80, and medical bills of $1300.

Herb v. Pitcairn, 1940, 306 Ill.App. 583, 29 N.E.2d 543; $30,000 to 49 year old switchman for loss of left foot and part of leg.

Badalamenti v. U. S., D.C., 67 F.Supp. 575, affirmed 2 Cir., 160 F.2d 422; $52,000 to 35 year old stevedore with life expectancy of 31.78 years for fracture of left hip plus shortening of leg and face and head injuries.

It is to be noted that defendants admit liability in this case yet they put plaintiff to nearly three years delay, plus the expense of a trial in the lower court and on appeal here. During this time plaintiff has had to finance his medical expense and loss of earnings, irrespective of defendants admitted liability. In addition plaintiff faces one or two more amputations on part of his foot and leg with no assurance that those operations will be successful.

Plaintiff will have $37,000.00 after medical expenses and loss of earning to date of trial have been deducted. In addition he will have to pay his attorneys for their work. While we don't know the amount of their fee, it is reasonable to expect they will collect the usual percentage of recovery in cases as this, which will in turn lower his recovery. Regardless of that, however, we think the lower court was not unreasonable in allowing him $37,000.00 for thirty-seven years of his life expectancy, for future pain and suffering and loss of earnings.

Defendants complain that plaintiff appeared at the trial of the case in the Superior Court using his "platform crutch" to aid in his walking. The brief stated: "His very appearance was such as to excite the sympathy of all who observed him."

█ Defendants also complain that while Dr. James Lytton-Smith was giving his testimony he had the plaintiff remove his sock and expose the bare stump of the foot to the jury. He then told the jury the nature of the injury explaining it in detail. The following is the portion of his testimony objected to by defendants:

"These are the pinch grafts (indicating plaintiff's foot) which we had reference to, and this is the area where the skin, some of it sloughed because of the angle at which the foot is made, and I will explain to you—just hold it there just a moment—you will remember that the leg and foot are built in such a fashion that the heel, this represents the heel (drawing on blackboard), the heel is here and this is the ankle joint, and that the remainder of the foot comes out in such fashion so that the weight is borne, is transferred down here, back here and over here. Now naturally when this portion of the foot is gone through there, the tendons that are attached back here will tend to tilt this forward, so this portion then becomes the weight bearing area. Ordinarily the foot bears weight on three points, on the heel, the base of the first metatarsal, which is back of the great toe, and on the fifth forward. In this instance, if you can understand that his weight is borne here, it will tilt this bone forward, and you see what he has. It is impossible. There are a few tendons here that were saved that tilt the foot forward, but the leverage is gone so that it will not pull forward. Naturally, then, his weight starts bearing in this area, and rubs and blisters it so that he can't walk very well without having to get back on the platform."

We consider this proper examination of a qualified surgeon, as we observe from the record this witness was. We find no reversible error in his testimony.

█ Defendant also complains of the testimony of Dr. William Guy Furth who, by the way, was the only witness in the whole case cross-examined by defendants. Defendants' complaint was that said Doc-

tor added his appeal to the sympathy and prejudice of the jury by his testimony. Defendant says in respect to Dr. Furth's testimony "while probably not legally objectionable, could have served only the purpose for which it was intended." That part of his testimony objected to by defendants follows:

"A. The talus is a bone of the foot, and the calcaneus, which is another bone of the foot. The bleeding vessels were ligated. Those were the vessels which were bleeding freely and causing the hemorrhage and shock. All bleeders were carefully tied off. The nerves which you find exposed were injected with absolute alcohol. The reason for that being to deaden the pain so that after operation they don't have a very painful stump. The flap was made from the overlying tissue and brought into opposition with the skin margin anteriorly. Two drains were inserted deep into the wound, the reason for this being this wound was loaded with cantaloupe seeds. As a matter of fact, it took us quite some time to wash those seeds out. After we did, it was questionable if we got all of them out, particularly when they were mixed in with the blood and the dirty area, and therefore, expecting infection, these drains were inserted. Then sulfa thiazole powder was sprinkled into the wound and the skin margins sutured and the patient left the operating room in good condition. That was done along with intravenous fluids which were given, and also—that is essentially the first story of the treatment, and the treatment I gave after the surgery."

We find from the transcript of evidence that there was no objection whatever to this testimony given by Dr. Furth. Neither was there any request to instruct the jury to disregard it. The examination of this surgeon was the correct way to explain such conditions to the jury.

■ We see no merit, whatever, to these objections. Whether the plaintiff needed a "platform crutch" to aid in his walking is not a matter for this court to determine. If it were not necessary he would take a risk in using it before an enlightened jury and it would hurt rather than help his cause. The testimony of the doctors is the only way the scientific truth as to the nature of the injuries can be revealed to a jury. We find no reversible error there.

■ Defendants complain that the prospective jurors Harold Murphy and Jesse Clawson were injurious to the defendants' case by the answers they gave to questions propounded, touching upon their qualifications to serve as trial jurors in the case. We have gone over these questions and answers very carefully and find nothing unusual about them. Murphy testified that he could not serve as a juror because he had had dealings with defendants and because of those dealings he could not give a fair trial to defendants.

Clawson testified "I kind of have my opinion already drawed on the case," and it was such an opinion that would prevent him from serving as a juror. We find that both of these two jurors were excused. There was nothing in the examination of these two jurors that would in any manner affect the panel selected from giving a fair and impartial trial to the defendants.

"Less we forget" Article 18, Section 6 of the Constitution of Arizona, reads:

"The right of action to recover damages for injuries shall never be abrogated, and the amount recovered shall not be subject to any statutory limitation."

Also Article 2, Section 23, reads in part:

"The right of trial by jury shall remain inviolate, * * *."

In the absence of clear and satisfactory evidence that the verdict of the jury was the result of such passion and prejudice as would make it mandatory on us to further reduce said verdict, we feel to do so would tend to violate the constitutional right of plaintiff to trial by jury.

We find nothing in the evidence calculated to create any passion or prejudice in the minds of the jury, but inasmuch as the trial judge had the opportunity of observing them during the course of the trial we do not feel disposed to disturb his findings and judgment in the matter.

We conclude that the remittitur ordered by the trial court was all that should be deducted from the verdict and there is no just ground for this court to further reduce the same.

The order and judgment of the trial court is affirmed.

PHELPS and DeCONCINI, JJ., concurring.

UDALL, Justice, with whom La PRADE, CHIEF JUSTICE, concurs (dissenting).

For the first time since becoming a member of the court I feel impelled to dissent; this for reasons of conscience as well as to voice my disapproval of certain legal principles as applied in the court's opinion.

There is no doubt that plaintiff suffered serious and painful injuries as a result of defendants' negligence, nor can it be questioned that he suffered pecuniary damages, past and prospective, for which he is entitled to be compensated. This much was admitted by defendants' answer. The parties being unable to agree upon the amount of damages that should be allowed, this issue alone was submitted to the jury, who by their verdict whittled down by nearly $5000 the amount for which plaintiff sued. On a motion for new trial the lower court found that:

"It appeared to the Court during the trial of this case that the jurors were overwrought with pity for the plaintiff to the extent of letting passion sway their judgment in assessing damages."

Whereupon the motion for new trial was denied upon the condition that plaintiff file a remitter of $9,717.04. A "remittitur" was filed and judgment for the reduced amount entered. The defendants then asserted the right, given them by statute, to appeal to this court insisting that the damages were still excessive.

The court's opinion severely castigates the defendants for not admitting liability for the entire amount sought under plaintiff's complaint, and for putting plaintiff to the long delay and expense of a trial in the lower court and an appeal here. I do not believe that a litigant should be thus criticized or penalized for either the "law's delay" or for asserting his constitutional and statutory rights. A supersedeas bond in the sum of $50,000 was posted by defendant, the plaintiff recovers his court costs in both courts, and the judgment is drawing interest in the interim at the rate of six per cent.

I fully realize that determination of the amount of damages is primarily the province of a jury and that courts are generally reluctant to interfere with their verdict. 15 Am.Jur., Damages, section 204. Nor am I unaware that there is an increasing tendency on the part of courts to sustain verdicts for larger amounts, due in part no doubt to lessened value of the dollar, nevertheless it was somewhat of a shock to me to have my brethren cite and quote with approval the federal case of Armentrout v. Virginian Ry. Co., supra, wherein a judgment in favor of a four-year-old boy for damages in the sum of $160,000 was entered. Our consciences would seem to vary greatly as to the point at which a jury approximates a sane estimate. I do not want to be understood as contending that a ceiling can be fixed or that a definite yardstick can be found by which to accurately measure these intangible elements of damage. Coppinger v. Broderick, 37 Ariz. 473, 295 P. 780, 81 A.L.R. 419; Standard Oil Co. v. Shields, 58 Ariz. 239, 119 P.2d 116. Full compensation, of course, is impossible in the abstract, and individuals will vary in their estimate of the sum which will be a just pecuniary compensation. Of necessity each case must stand upon its own facts and circumstances, for no two are exactly alike; hence, judgments in other cases of similar character do not present a controlling criterion.

I do not contend that the record before us shows such passion and prejudice on the part of the jury that the taint of the vice cannot be cured by a remitter. But I do maintain that where the trial court found that pity and passion had swayed the judgment of the jury in assessing damages it was its statutory duty to either grant a new trial or offer the plaintiff an opportunity to file a remitter of the amount

"which it deems excessive". Section 21-1403, A.C.A.1939. The trial judge presumably met this obligation according to his best lights.

In many states, in a situation of this kind, the rule is that unless the appellate court can find an abuse of discretion on the part of the trial court in the amount fixed by the latter on remitter, its judgment must stand. 39 Am.Jur., New Trial, sections 210, 212. See Ticknor v. Seattle-Renton Stage Line, 139 Wash. 354, 247 P. 1, 47 A.L.R. 252; Stelmach v. Saul, Mo. App., St. Louis, 50 S.W.2d 721; Southern Fruit Distributors v. Fulmer, 4 Cir., 107 F.2d 456. Such however is not the rule in this jurisdiction, for by statute:

"Remitter or increase of judgment.—The court may order that if the party who has recovered damages shall, within such time as the court may fix, file a remitter from the judgment, of the amount *which the court deems excessive,* the judgment as to the remainder of the damages be affirmed, otherwise reversed and a new trial ordered; * * *" (Emphasis supplied.) Section 21-1833, A.C.A.1939. See Jacob v. Miner, 67 Ariz. 109, 191 P.2d 734.

In the light of this statutory provision, I am unable to follow the view of the majority that a jury's verdict is so sacrosanct that it must not and cannot be touched. It would seem that to be consistent, the majority, having stated "we find nothing in the evidence calculated to create any passion or prejudice in the minds of the jury",

should have reinstated the jury's verdict of $56,000 for that is the true amount in controversy on this appeal. Section 21-1401, A.C.A.1939. Certainly a verdict disapproved by the trial court is not entitled to the same weight as one which the trial judge has approved. 5 C.J.S., Appeal and Error, § 1653b, page 669; Braswell v. Virginia Electric & Power Co., 162 Va. 27, 173 S.E. 365, 369.

I understand the opinion of the court to say, at least by implication, that to further reduce said verdict "would tend to violate the constitutional right of plaintiff to trial by jury." Such a statement is contrary to the pronouncements of the text-writers and the numerous reported cases, including a decision of the Supreme Court of the United States, infra, involving an appeal from this court. Joyce on Damages, volume 1, section 102, expresses the governing rule in these words:

" * * * Again, the parties are not deprived of their constitutional right of trial by jury by the affirmance of a judgment upon the remittitur of a suggested sum; * * *."

See also Hale on Damages, 2d Ed., sections 96, 97, page 347. The reason behind this accepted principle is stated by Sutherland on Damages, 4th Ed., volume 2, section 450:

" * * * In naming a sum for which the plaintiff may take judgment in the circumstances above indicated the right of

the defendant to a jury trial is not invaded if the amount be placed as low as in all reasonable probability the jury found by their verdict, independent of the prejudicial elements. That is, the court in such a case should not undertake to say what sum of money will measure the plaintiff's loss, but what sum the jury said, by their verdict, stripped of its prejudicial elements, and giving the defendant the benefit of reasonable probabilities in respect to the amount of the recovery, will measure such loss. The course indicated may be pursued either in the trial or appellate court, whether the excessiveness of the award is due to perversity or not. * * *"

In discussing the power of an appellate court to reduce an excessive judgment it is said in 3 Am.Jur., Appeal and Error, section 1177:

"In so affirming a judgment on condition of remittitur, the court is not substituting its judgment for that of the jury. By such action the court does not indicate what amount it would have given, but only such amount as it would not feel at liberty to pronounce excessive."

For a few of the leading cases from other jurisdictions on this point, see: Malliet v. Super Products Co., 218 Wis. 145, 259 N.W. 106; Alter v. Shearwood, 114 Ohio St. 560, 151 N.E. 667; Texas & N. O. R. Co. v. Syfan, 91 Tex. 562, 44 S.W. 1064; World Oil Co. v. Hicks, 129 Tex. 297, 103 S.W.2d 962.

I consider the question foreclosed in this state by the decision of the Supreme Court of the United States in the case of Gila Valley, G. & N. R. Co. v. Hall, 232 U.S. 94, 34 S.Ct. 229, 58 L.Ed. 521, affirming the decision of this court reported in 13 Ariz. 270, 112 P. 845, interpreting our statutes which specifically authorize both the trial and appellate court to order remitters in lieu of the granting of a motion for a new trial. The court held that such procedure does not contravene the constitutional right of trial by jury.

Unquestionably the defendants should be required to fairly compensate plaintiff for the grievous injuries suffered by him as a result of their negligence. The item of $9282.96 for special damages, incorporated in the judgment, does adequately compensate for out-of-pocket cash for loss of truck, artificial foot, hospital and medical expenses incurred and to be incurred, including $4520 for loss of wages. While the amount of recovery in tort actions is in nowise governed by the scale of compensation set up by the legislature in industrial cases, it is interesting to note that the jury's verdict, even as reduced by the trial court, allows four times more than could have been recovered under a similar industrial loss. No part of this judgment is subject to either state or federal income taxes. While the regrettable injury is permanent, the disability is only partial and does not present an insurmountable handicap. If large and unconscionable verdicts are en-

couraged and permitted to stand, then the average company or individual in this modern mechanical age is living in a somewhat precarious state, for a verdict such as this might well ruin them financially and enslave the individual indefinitely. .

I accept the responsibility placed upon me by the statute, section 21-1833, supra, and adopt the implied interpretation thereof laid down in the Shields case, that a remitter should be granted "when the amount of the verdict as compared with the legal damages shown by the evidence is so great as to shock the conscience of the appellate court." [58 Ariz. 239, 119 P.2d 119] Searching my own conscience, and speaking as one member of the court, I can only say that I do not stand in such awe of either the jury's verdict or the trial court's judgment under the circumstances here before us as to dissuade me from declaring that I would consider any judgment greater than $25,000, plus the proven special damages of $9,282.96, to be excessive. I would therefore order a further remitter or reverse the case for a new trial.

## On Rehearing

STANFORD, Justice.

Plaintiff (appellee) brought this action against the defendants (appellants) in the superior court to recover for personal injuries and property damage resulting from a collision caused by the negligence of the defendants.

Defendants admitted their liability leaving for the determination of the jury only the amount that plaintiff should recover.

The personal injuries resulted in a permanent partial disability of the plaintiff, who was then a man of the age of twenty-six years, having a wife and small daughter.

For thirty days immediately prior to the accident the net earnings of the plaintiff were $380. Plaintiff commenced the business of trucking in January, 1946, when he received a certificate of convenience and necessity from the Arizona Corporation Commission permitting him to engage in the trucking business.

On July 9, 1946, he was engaged in hauling cull cantaloupes from a packing shed on Grand Avenue in Maricopa County, Arizona. At about three o'clock in the afternoon he had loaded his truck with cantaloupes, and had driven out onto Grand Avenue and started toward the City of Phoenix. While on the right-hand side of the highway his truck was struck from the rear by a truck and semi-trailer of the defendant Alabam Freight Lines. The testimony shows that the truck of the defendant Alabam Freight Lines was traveling at a speed of about forty-five miles per hour at the time of the impact and that there was no slackening of speed prior to the same. Plaintiff's loaded truck was knocked some sixty feet and overturned with all four wheels in the air.

In addition to cuts and bruises all over the body of plaintiff, his left foot was badly mangled and crushed. A portion of the said foot was amputated. A second operation was required on September 3, 1946. In this operation plastic surgery was performed, skin being taken from plaintiff's thigh and grafted on to the wounded area. Some thirty areas of skin were thus transplanted. Plaintiff remained in the hospital from the date of the injury until September 25, 1946, and was continually under the care of a doctor until September 15, 1947. An artificial limb was recommended and obtained, but, because of the nature of the injury, the plaintiff could not bear his weight upon the stump without causing ulcerations at the place of amputation. It will be necessary hereafter to perform another operation and amputate the remaining portion of the foot and ankle except for the flap of the heel which, if sufficient, will be pulled over the stump of the bone to provide a weight-bearing pad. If this is not possible, the entire lower leg will have to be amputated at a point approximately six inches below the knee. Under the testimony it will require from three to six months following this operation before plaintiff can again be able to work.

The case was tried before a jury and a unanimous verdict was rendered in behalf of plaintiff in the sum of $55,000 for personal injury and $1,000 for damage to plaintiff's truck. After judgment was entered on the verdict, a motion for new trial was filed by defendants which was denied by the trial court on condition, however, that the judgment be remitted to $46,282.96, which remittitur was filed by the plaintiff pursuant to the court's order. This appeal was taken from the judgment and order denying the motion for new trial.

The three assignments of error submitted by the defendants are embodied in the proposition of law as follows:

"Where damages awarded for personal injury are excessive and appear to have been given by the jury under the influence of passion or prejudice, a new trial should be ordered or the verdict reduced to a reasonable amount."

In their argument defendants first rely on the rule in the case of Standard Oil Co. of Calif. v. Shields, 58 Ariz. 239, 119 P.2d 116, 119, in support of their contention. We quote from that case which is one of Arizona's leading cases on the subject of excessive damages:

" * * * She bases her argument on this point on the proposition that passion and prejudice can only appear when (a) improper evidence was admitted upon which the jury might have acted, (b) improper instructions of law were given which might have misled the jury, (c) the argument of counsel was outside the record and of such a nature as might have been calculated to arouse the prejudice of the jury, and (d) there is proof of some misconduct on the part of the jury, and that if none of these matters appear from the rec-

ord, the court may not set aside a verdict on this ground. Any one of the causes mentioned by plaintiff would be sufficient, of course, to authorize an appellate court to presume passion and prejudice, but we think she has omitted a fifth ground, which is, when the amount of the verdict as compared with the legal damages shown by the evidence is so great as to shock the conscience of the appellate court. * * *

"The damages permissible in a case of this nature may be divided legally into three classes, (a) out of pocket expenses for past and prospective medical and other items rendered necessary by the accident, and damage to plaintiff's automobile. These may be calculated with reasonable certainty; (b) loss of earning power by reason of injury, which may be calculated on an evidentiary basis, although not always with the same certainty as the first class; and (c) pain and suffering, past and prospective. This last, of course, is an item for which no definite rule of estimation may be given and, therefore, a great amount of discretion may, and properly should, be left to the jury. But even here we think there is a limit. It is often said in argument on this point, 'For how much would a man be willing to suffer the same injuries as those which plaintiff has suffered.' This, of course, is not a proper test of legal damages. No man in his senses would accept any sum to undergo voluntarily the pain and suffering caused by many of the injuries which appear in negligence cases, and yet a verdict for pain and suffering, past and prospective, caused by such an injury might well be so excessive that we would be compelled to state it was based on sympathy for the victim and prejudice against the defendant, rather than a reasonable and dispassionate consideration of the whole situation."

Our comment here is that certainly within a nation that has its times of war; its times of depressions; and, its times of prosperity, it would seem impossible to fix a measuring rod by which damages in cases of this nature could be measured.

Defendants have cited many cases where excessive verdicts for the loss of a foot were given. Among them are: Cole v. St. Louis-San Francisco Ry. Co., 332 Mo. 999, 61 S.W.2d 344; Bassett v. Milwaukee Northern Ry. Co., 169 Wis. 152, 170 N.W. 944; Kurn v. Campbell, 188 Okl. 636, 112 P.2d 386; Otos v. Great Northern Ry. Co., 128 Minn. 283, 150 N.W. 922; Galveston etc. R. Co. v. Andrews, Tex.Civ.App., 291 S.W. 590; Grennon v. New Orleans Public Service, Inc., 10 La.App. 641, 120 So. 801; Atlantic Coast Line R. Co., v. Kinlaw, 117 Fla. 166, 157 So. 341; Wichita Falls etc. Co. v. Combs, Tex.Civ.App., 250 S.W. 714; Curran v. Union Stockyards Co., 111 Neb. 251, 196 N.W. 135; White v. Davis, 103 Cal.App. 531, 284 P. 1086; Reed v. Terminal R. Ass'n of St. Louis, Mo.Sup., 62 S.W.2d 747.

The trial court has already made a substantial deduction by required remittitur. In its order the court stated:

"In ordering a remitter herein the court has taken into consideration that there is presently a substantial decrease of purchasing power of the dollar.

"The plaintiff's medical expense, damage to truck, and loss of earnings for twenty-four months following date of injury add up to $9,282.96. The jurors had these figures before them in assessing damages at $56,000.00. If the jury considered this sum as special damages in arriving at its verdict, the general damages assessed would be $46,717.04. To bring the verdict in this case in line with verdicts rendered and sustained in similar cases, not only in this state but also in other jurisdictions, the court is of the opinion that the verdict is excessive in the amount of $9,717.04. If the verdict is reduced in this amount, after compensating plaintiff for his actual damages, it will pay him $1,000.00 a year during his life expectancy, 37 years, for pain and suffering and future loss of earnings."

In support of the view that the verdict is not excessive under present inflationary conditions we quote for the reasoning therein only from Armentrout v. Virginian Ry. Co., D. C., 72 F.Supp. 997, 1001:

" * * * They need not close their eyes to the economic facts of life. It is possible, of course, that values may cease to be affected by inflation of the currency. Economic conditions may conceivably cause the value of the dollar again to rise to the point where it stood before the World War II. On the other hand, there is no assurance that its value may not become less as time goes on. This possibility balances, if it does not outweight, the contrary forecast. * * *"

This case, however, was reversed in 4 Cir., 166 F.2d 400, but its reasoning is sound. For other cases where very substantial judgments have been affirmed, we cite the following:

Greenberg v. Garfield-Passaic Bus Company, 1946, 134 N.J.L. 371, 48 A.2d 389; $85,000 for amputation of both legs of 55 year old housewife.

Beam v. Baltimore & O. Railway, 1945, 77 Ohio App. 419, 68 N.E.2d 159; $75,000 for loss of both legs of brakeman earning $280 per month with life expectancy of 25 years.

Bosher v. International Railway, D.C. 1926, 15 F.2d 388; $45,000 for amputation of one leg and injury to other leg of 39 year old man with annual income of $1,-385.80, and medical bills of $1300, with life expectancy of 29 years.

Herb v. Pitcairn, 1940, 306 Ill.App. 583, 29 N.E.2d 543; $30,000 to 49 year old switchman for loss of left foot and part of leg; reversed on other grounds.

Howard v. Baltimore & O. C. T. R. Co., 327 Ill.App. 83, 63 N.E.2d 774; $50,000

awarded 51 year old switchman for injuries including amputation of arm.

It is to be noted that defendants admit liability in this case, yet during all of this time plaintiff has had to finance his medical expense and loss of earnings, irrespective of defendants admitted liability. In addition plaintiff faces one or two more amputations of part of his foot and leg with no assurance that those operations will be successful.

Plaintiff will have $37,000.00 after medical expenses and loss of earnings to date of trial have been deducted. We think the lower court was not unreasonable in allowing him that amount for thirty-seven years of his life expectancy, for future pain and suffering, and for loss of earnings.

Defendants complain that plaintiff appeared at the trial of the case in the superior court using his "platform crutch" to aid in his walking. The brief stated: "His very appearance was such as to excite the sympathy of all who observed him."

Defendants also complain that while Dr. James Lytton-Smith was giving his testimony he had the plaintiff remove his sock and expose the bare stump of the foot to the jury. He then told the jury the nature of the injury explaining it in detail. The following is the portion of his testimony objected to by defendants:

"These are the pinch grafts (indicating plaintiff's foot) which we had reference to, and this is the area where the skin, some of it sloughed because of the angle at which the foot is made, and I will explain to you —just hold it there just a moment—you will remember that the leg and foot are built in such a fashion that the heel, this represents the heel (drawing on blackboard), the heel is here and this is the ankle joint, and that the remainder of the foot comes out in such fashion so that the weight is borne, is transferred down here, back here and over here. Now naturally when this portion of the foot is gone through there, the tendons that are attached back here will tend to tilt this forward, so this portion then becomes the weight bearing area. Ordinarily the foot bears weight on three points, on the heel, the base of the first metatarsal, which is back of the great toe, and on the fifth forward. In this instance, if you can understand that his weight is borne here, it will tilt this bone forward, and you see what he has. It is impossible. There are a few tendons here that were saved that tilt the foot forward, but the leverage is gone so that it will not pull forward. Naturally, then, his weight starts bearing in this area, and rubs and blisters it so that he can't walk very well without having to get back on the platform."

We consider this proper examination of a qualified surgeon, as we observe from the record this witness was. We find no reversible error in his testimony.

Defendant also complains of the testimony of Dr. William Guy Furth, who, by the way, was the only witness in the whole case cross-examined by defendants. Defendants' complaint was that said Doctor added his appeal to the sympathy and prejudice of the jury by his testimony. Defendant says in respect to Dr. Furth's testimony "while probably not legally objectionable, could have served only the purpose of which it was intended." That part of his testimony objected to by defendants follows:

"A. The talus is a bone of the foot, and the calcaneus, which is another bone of the foot. The bleeding vessels were ligated. Those were the vessels which were bleeding freely and causing the hemorrhage and shock. All bleeders were carefully tied off. The nerves which you find exposed were injected with absolute alcohol. The reason for that being to deaden the pain so that after operation they don't have a very painful stump. The flap was made from the overlying tissue and brought into opposition with the skin margin anteriorly. Two drains were inserted deep into the wound, the reason for this being this wound was loaded with cantaloupe seeds. As a matter of fact, it took us quite some time to wash those seeds out. After we did, it was questionable if we got all of them out, particularly when they were mixed in with the blood and the dirty area, and therefore, expecting infection, these drains were inserted. Then sulfa thiazole powder was sprinkled into the wound and the skin margins sutured and the patient left the operating room in good condition. That was done along with intravenous fluids which were given, and also—that is essentially the first story of the treatment, and the treatment I gave after the surgery."

We find from the transcript of evidence that there was no objection whatever to this testimony given by Dr. Furth. Neither was there any request to instruct the jury to disregard it. The examination of this surgeon was the correct way to explain such conditions to the jury.

We see no merit, whatever, to these objections. Whether the plaintiff needed a "platform crutch" to aid in his walking is not a matter for this court to determine. If it were not necessary he would take a risk in using it before an enlightened jury and it would hurt rather than help his cause. The testimony of the doctors is the only way the scientific truth as to the nature of the injuries can be revealed to a jury. We find no reversible error there.

Defendants complain that the prospective jurors Harold Murphy and Jesse Clawson were injurious to the defendants' case by the answers they gave to questions propounded, touching upon their qualifications to serve as trial jurors in the case. We have gone over these questions and answers very carefully and find nothing unusual about them. Murphy testified that he could not serve as a juror because he

had had dealings with defendants and because of those dealings he could not give a fair trial to defendants. Clawson testified "I kind of have my opinion already drawed on the case," and it was such an opinion that would prevent him from serving as a juror. We find that both of these two jurors were excused. There was nothing in the examination of these two jurors that would in any manner affect the panel selected from giving a fair and impartial trial to the defendants.

"Lest we forget" article 18, section 6 of the Constitution of Arizona, reads:

"The right of action to recover damages for injuries shall never be abrogated, and the amount recovered shall not be subject to any statutory limitation."

In the absence of clear and satisfactory evidence that the verdict of the jury was the result of such liberality or passion and prejudice as would make it mandatory on us to grant a new trial or to order a further remittitur, we feel to do so is wholly unjustified.

We find nothing in the evidence calculated to create any passion or prejudice in the minds of the jury, but inasmuch as the trial judge had the opportunity of observing them during the course of the trial we do not feel disposed to disturb his findings and judgment in the matter.

We conclude that the remittitur ordered by the trial court was all that should be deducted from the verdict and there is no just ground for this court to further reduce the same.

The order and judgment of the trial court is affirmed.

PHELPS and DeCONCINI, JJ., concurring.

LaPRADE, Chief Justice, and UDALL, Justice (dissenting).

To the above decision we reiterate, in so far as it is now pertinent, the dissent registered to the original opinion rendered on March 2, 1949.